UNITED STATES, Appellee

v.

HORACE A. HAWKINS, Private E-2, U. S. Army, Appellant

6 USCMA 135, 19 CMR 261

No. 5955

Decided July 1, 1955

*First Lieutenant Joseph B. Axelman* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Joseph L. Chalk* and *Major Edwin Doran.*

*First Lieutenant A. Kenneth Pye* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

### I

The accused stands convicted by a general court-martial of the wrongful possession of heroin, a habit-forming drug, and breaking restriction, both in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was sentenced to dishonorable discharge, total forfeitures, and confine- ment for five years. Intermediate re- viewing authorities have affirmed the findings and sentence, and we granted the petition for review to determine two questions. First, whether the law offi- cer erred in ruling that Government witnesses were not required to disclose the identity of, or the instructions giv- en to, an informant against the accused. Second, whether it was error for the law officer not to require the attendance of

a witness requested by the defense. The questions relate to the heroin charge, and only the facts pertinent to that offense will be stated.

At about 3:30 p.m. on the afternoon of April 21, 1954, Treasury Department Agent Salvatore Giovino and three Criminal Investigation Detachment investigators, Mr. Sterner and Sergeants McGregor and Sampson, met at Camp Kilmer, New Jersey, and prepared a list of the serial numbers of some $15.00 in United States currency. The money was then turned over to an informant, probably one Cleveland White, who was a prisoner at the camp stockade.

The accused, who was assigned as a guard at the stockade, was later seen leaving the confines of Camp Kilmer. Upon his return the following morning, he was taken into custody by the Criminal Investigation Detachment agents and searched. A small envelope, containing a white powder which, upon subsequent analysis, turned out to be heroin, was found in his wallet. In addition, a $1.00 bill, bearing the same serial number as one of those recorded the preceding day, was found on his person.

Somewhat later on the same day, the accused was interrogated by the investigators and he executed a written statement, the voluntary character of which is not contested. He admitted therein that White had approached him and requested that he buy some narcotics for White, and that he, as a "favor," had done so. White had furnished the money, and the purchase was made in New York City on the night of April 21–22, 1954.

The first issue arises out of the ensuing facts and circumstances. The accused defended solely on the theory that he was the victim of an entrapment, and as part of his asserted defense he established that he had no reputation as a narcotics user or dealer, either within his unit or the stockade. To support further his theory he attempted to elicit from Mr. Giovino, the Treasury agent, both on cross-examination as a Government witness and on direct examination as a defense witness, the name of, and the instructions given

138

to, the informant relied upon by the investigative personnel in this case. An objection to this line of questioning was sustained by the law officer on the theory that public policy forbids the disclosure of such information. Attempts by the defense to obtain the same information from other witnesses met the same fate. Counsel, in his arguments in opposition to the rulings, conceded the general principle of confidentiality of communications to public officials but argued that it could not be applied in this instance as the defense of entrapment could not be established unless the law officer required a disclosure. When his arguments turned out to be singularly unpersuasive, he tendered an offer of proof to the effect that the witnesses, if forced to answer, would name Private Cleveland White as the informant in this case; that they would disclose they had furnished the money to the informant; that they would testify they had requested the informant to contact the accused and persuade him to obtain narcotics for the informant; and that their evidence would establish that the plan was conceived by them to induce the accused to commit the offense.

The second question involves a somewhat similar principle. Immediately prior to trial, counsel for the accused requested the presence of White as a defense witness. The request was denied on the grounds that the application was not timely. Counsel repeated his request near the close of the trial, and at that time the law officer refused the request on the theory that the testimony would concern only matters which were confidential or cumulative.

II

A resolution of the first issue presented here requires consideration of the nature and extent of the privilege to have an informant's identity, and the plan under which he and the officials operated, denied to an accused at trial. As a general proposition, "communications made by informants to public officers engaged in the discovery of crime are privileged." Manual for Courts-Martial, United States, 1951, paragraph 151b, page 284; 58 Am Jur, Witnesses,

§ 534, page 300. Subject to certain limitations, the court, of its own motion, should refuse to receive evidence of any communication unless it appears that the privilege has been waived by the appropriate governmental authorities entitled to the benefit of it. Manual, supra. The reason underlying the rule is this: "To inform is a statutory duty, and sound public policy forbids exposing informers to possible, even probable evil consequences." United States v. Rogers, 53 F2d 874 (DC NJ) (1931); McInes v. United States, 62 F 2d 180, 181 (CA 9th Cir) (1932).

The leading case in Federal law on this subject is Scher v. United States, 305 US 251, 59 S Ct 174, 83 L ed 151 (1938), where it was observed that "public policy forbids disclosure of an informer's identity unless essential to the defense, as, for example, where this turns upon an officer's good faith." But the privilege is limited to the situation where the informer is an informer and nothing more, as where he furnished a "tip" which results in the apprehension of an accused, or supplies police officials with information which leads them to evidence establishing reasonable cause to conduct a search. Nichols v. United States, 176 F2d 431 (CA 8th Cir) (1949); McQuaid v. United States, 198 F2d 987, 990 (CA DC Cir) (1952); Mitrovich v. United States, 15 F2d 163 (CA 9th Cir) (1926).

The rule that the privilege does not run to one who exceeds the bounds of an informer is succintly stated in the following quotation from United States v. Conforti, 200 F2d 365, 367 (CA 7th Cir) (1952):

"We agree that under the circumstances disclosed by the evidence in this case the defendant had a right to demand a disclosure of the indentity [sic] of No. 54. We think it would have been error for the trial court to refuse such a demand. The Government insists, and correctly so, that communications made by informers to the Government are privileged. But the unidentified person, No. 54, involved in this case was more than a mere informer. He was not simply an individual who, knowing that the defendant had committed or was about to commit a crime, communicated that knowledge to the authorities so that the police, acting independently, might then procure evidence of the crime. On the contrary, No. 54 played a part with the defendant in the very transactions upon which the Government relies to prove its case."

In Sorrentino v. United States, 163 F2d 627, 629 (CA 9th Cir) (1947), it was concluded that where Government agents rely upon an informant to buy narcotics from a suspect, and the informant goes alone to make the purchase, he becomes more than just an informant. The rule set out in that case and the Conforti case, supra, is applicable in this instance and the accused was entitled to a disclosure of the alleged informant's identity and his presence as a witness, just as he would be entitled to learn the identity and probable testimony of any other participant. Portomene v. United States, 221 F2d 582, 584 (CA 5th Cir) (1955).

As will later be shown, we believe that if we accept as a premise the proposition that White was an informer only, the law officer erred in denying defense counsel access to his identity and testimony as such, because of an exception to the privilege at issue here. In that connection we will subsequently marshal the evidence to show that White's testimony was essential to the defense offered at trial. However, to avoid being repetitious, it is only necessary at this point to note that the facts which show that White was a participant and not merely an informant, so as to bring this case within the rule of Sorrentino v. United States, supra, will disclose that he also was an essential witness for the accused.

Although we could stand on the ground that the law officer erred as to both issues because White did not qualify as an informant and thus fell outside the privilege, we prefer to develop the principles applicable to a true informer, because of their importance to the services.

## III

Assuming that only a true informer is involved, the privilege of confidentiality is subject to one ▆▆▆▆▆▆ ▆ qualification. That is, when the identity of testimony of the informant is necessary or essential to the defense, the accused may compel a disclosure of that information. Scher v. United States, supra; Wigmore, Evidence, 3d ed, § 2374. The reasons for that qualification are not difficult to understand. If the qualification did not exist, public officials would be enabled to produce such bits of evidence as they saw fit for their purposes and to withhold testimony which might establish the innocence of an accused. In such a situation, the rule of policy must give way to the rule of justice. Wilson v. United States, 65 F2d 621, 624 (CA3d Cir) (1933). For that reason, if the evidence which is sought to be disclosed would be necessary as tending to shed light on the guilt or innocence of an accused, he is entitled to compel its disclosure. United States v. Li Fat Tong, 152 F2d 650, 652 (CA 2d Cir) (1945); United States v. Coplon, 88 F Supp 921, 928 (SD NY) (1950); Smith v. United States, 9 F2d 386 (CA 9th Cir) (1925). Viewing this record as a whole, is it likely that a disclosure of White's identity and the arrangements made with him by the investigators would tend to shed light on the merits of the case? The answer to that question depends, in part, upon the nature of the defense offered at trial and the relevancy of the evidence to that issue.

## IV

We have previously given some consideration, in United States v. Buck, 3 USCMA 341, 12 CMR 97, to the nature of the defense of entrapment and said that where:

". . . the plan of the crime is conceived by the authorities, who then lure an otherwise innocent man to its accomplishment . . . the Government is estopped from contending that the person so enticed is guilty, for Government officials instigated the very conduct of which they complain."

In Sorrells v. United States, 287 US 435, 53 S Ct 210, 77 L ed 413 (1932), Mr. Justice Roberts, in a separate concurrence, offered the following definition:

". . . Entrapment is the conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer."

Perhaps the most widely quoted Federal opinion on the defense of entrapment is Butts v. United States, 273 Fed 35 (CA 8th Cir) (1921). In that case it was shown that the defendant had never sold or dealt in narcotics prior to the transaction which formed the basis of his prosecution, although he had become addicted to the use of morphine to relieve his suffering from the pain of tuberculosis of the bone. It was established that Government agents prevailed upon a friend and fellow-addict to go to the accused and ask the accused for some narcotics. After considerable persuasion, the accused obtained the desired merchandise from a third party. The Circuit Court summed up the facts of the case by concluding that:

". . . the conception of and the intention to do the acts which the defendant did in this matter did not originate in his mind or with him, but were the products of the fertile brains of the officers of the government, which they instilled into the mind of the defendant, and by deceitful representations and importunities lured him to put into effect."

The court thereafter held that entrapment was raised as an issue and that appropriate instructions on the subject should have been given, but as part of the reasoning for that holding Judge Sanborn observed:

"The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing

it. Here the evidence strongly tends to prove, if it does not conclusively do so, that their first and chief. endeavor was to cause, to create, crime in order to punish it, and it is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it."

As a general proposition, a rule defining the course of conduct by Government officers which will constitute entrapment cannot be stated, United States v. Perkins, 190 F2d 49, 51 (CA 7th Cir) (1951). However, it is clear that entrapment is not a defense if the accused was already engaged in an existing course of similar criminal conduct, had already formed a design to commit the crime or similar crimes, or was willing to do so as evinced by ready complaisance. United States v. Chiarella, 184 F2d 903, 908 (CA2d Cir) (1950). Perhaps the best rule to be applied in this case is found in the following statement: "For the offense to originate in the mind of the defendant, it was not necessary that the defendant be the instigator of the particular sale or act, but only that she [he] have the general intention to commit such an offense whenever the opportunity offered." Demos v. United States, 205 F2d 596, 599 (CA5th Cir) (1953); United States v. Lemons, 200 F2d 396, 397 (CA7th Cir) (1952).

We wish to make it clear that in our view enforcement officials may smooth the path of one intent upon the commission of a crime and afford him "ample opportunity to rush to his own destruction," United States v. Buck, supra; Vamvas v. United States, 13 F2d 347 (CA5th Cir) (1926); provide marked money, as was done in this case, Sauvain v. United States, 31 F2d 732 (CA8th Cir) (1929); use "decoys" to apprehend law violators, Ryles v. United States, 183 F2d 944, 945 (CA10th Cir) (1950); or engage in other stratagems and forms of trickery. But those tactics may not be joined with initiation of a criminal scheme by law enforcement officers who then inspire or incite its execution by a person who otherwise would not have attempted the commission of an offense.

Although we have set out generally what is required in the way of evidence to establish an entrapment, the trouble we encounter in this case arises because the accused made a start toward establishing his defense, but he was blocked from developing it by the ruling of the law officer. Here the evidence goes only far enough to show that the law enforcement officials had some reason to suspect the accused; that they conceived some plan to bring about his arrest; that the accused had no reputation as either a dealer in or a user of habit-forming drugs, either in military or civilian life; that he had not been previously apprehended as a user or peddler of narcotics; that the alleged informant was a known narcotics user; that it was necessary for him to work through a guard to obtain the drug while incarcerated in the stockade; and that the informant was sent alone, with marked money, to the accused. From that point on, we are forced to speculate as to the existence of evidence which would directly assist the accused in his defense. Because of the ruling of the law officer, nothing is shown as to why the accused was chosen as a likely suspect; the nature, scope, and details of the prearranged plan are not disclosed; whether the informant was told by the officials to persuade the accused to obtain the narcotics is not developed; what the informant might have said to the accused, what importunities he might have made, or what entreaties of succor he might have voiced while pretending to be suffering from withdrawal symptoms we do not know; and other evidence relevant to entrapment is missing. However, from the offer of proof, the following situation is reasonably inferable: that the investigators persuaded and incited the informant to importune the accused to commit the offense; that they conceived the plan to trap him and selected one with a powerful appeal as their agent

**141**

to execute their scheme; that they furnished the money he was to use and retained a record of the serial numbers; that they instructed him as to his modus operandi; that their instructions caused the informant to induce the accused to commit an offense to help a person in distress, when the accused otherwise would not have done so.

While the offer of proof contained some conclusions and was not the personification of completeness, it was adequate to show the minimal standards of a defense. We need not measure its weight precisely as the denial of the law officer was not based on the insufficiency of the evidence proffered by the accused but was expressly predicated upon an expressed opinion that the rule governing confidential communications precluded the Government's witnesses from testifying to their activities with, or statements to, the informant. The law officer was convinced that the confidential privilege could be relied upon by the Government solely because he overlooked the exception to the rule. In our view, however, the matters treated as privileged at trial were essential to the accused's defense. We, therefore, hold that in so limiting the scope of cross-examination, the law officer erred to the substantial prejudice of the accused.

V

The second question requires us to hold that the law officer denied the accused a further substantial right. Prior to reaching that question, we must dispose of a closely related preliminary matter. On the day prior to trial, the accused requested in writing that White be produced as a witness. The request was refused by the convening authority on the ground that it was not timely made. We are at a loss to understand that ruling. So far as we can glean from the record, the desired witness was in the stockade in Camp Kilmer, where the trial was held. If so, he could have been brought over to testify in short order. We find nothing untimely about a request for subpoena which will permit the production of a

142

witness without interrupting the time schedule of the prosecution. The necessities for having a witness present often do not arise until the trial has proceeded well along toward finality and the touchstone for untimeliness should be whether the request is delayed unnecessarily until such a time as to interfere with the orderly prosecution of the case. Even then, if good cause is shown for the delay, a continuance should be granted to permit the evidence to be produced. Clearly, from what is before us, the accused was denied a substantial right, but we need not consider the possibility of prejudice resulting from this particular denial as the law officer offered a continuance if defense counsel could establish the competency of the desired evidence. We, therefore, pass to that facet of the second issue.

Not only a disclosure of the identity of the informant was essential to this accused, but also, as we have demonstrated, the evidence he could furnish. We are faced with the defense of entrapment, and the testimony of the informer would have been relevant and not privileged on that issue. Moreover, it is important in this connection to note that the Government relied on White to execute the plan with accused, and under those circumstances his lips cannot be sealed by a claim of confidentiality. We fail to see how or in what way, it would have violated any confidence for White to have testified to the details of his participation with the accused. Those were already known by all parties, and he was in a position to furnish information as to what extent he was directed to and did cause or incite the accused to commit the offense. The accused was entitled to require him to tell what efforts were made by him to persuade the accused to become involved in the purchase of the drug. He was a keystone figure in the defense of entrapment, and his testimony would have shed light on that issue.

For the reasons stated, the decision of the board of review is reversed. The record is returned to The Judge Advocate General of the Army for reference

to a board of review. A rehearing may be ordered.

Chief Judge QUINN and Judge BROSMAN concur.