UNITED STATES, Appellant and Cross-Appellee

v

GEORGE H. FRENCH, Captain, U. S. Air Force,
Appellee and Cross-Appellant

10 USCMA 171, 27 CMR 245

172

173

No. 11,318

Decided February 6, 1959

*Major Fred C. Vowell* argued the cause for Appellant and Cross-Appellee, United States. With him on the brief were *Lieutenant Colonel Robert W. Michels* and *Lieutenant Colonel John F. Hannigan*.

*Lieutenant Colonel Robert O. Rollman* argued the cause for Appellee and Cross-Appellant, Accused. With him on the brief were *Lieutenant Colonel Ellis L. Gottlieb* and *Lieutenant Colonel Sam F. Carter*.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

I

Following his conviction of four offenses charged in violation of Article 134 of the Uniform Code of Military Justice, 10 USC § 934, the accused was sentenced to dismissal, total forfeitures, and confinement at hard labor for life. The convening authority affirmed the findings and sentence as adjudged. A board of review in the office of The Judge Advocate General of the Air Force affirmed the findings but, for reasons which will be hereinafter discussed, reduced the period of confinement to ten years but otherwise approved the sentence. The Judge Advocate General of the Air Force certified one question to this Court, and we granted accused's petition for review on other grounds. Each will be indicated in the course of our discussion.

Because the facts are largely uncontroverted and the parties have accepted those stated by the board of review as being correct, we state them substantially as shown in the board's opinion. In December 1956, the accused, assigned to an Air Force base in Puerto Rico, was heavily in debt as a result of gambling and drinking. He considered selling classified information to alleviate his drastic financial situation. While attending a special weapons school at his base he had access to docu-

ments classified "Restricted Data." In January 1957, he took some of the classified documents described in three of the specifications and in the month of March took the remainder. On April 2, 1957, he drafted a letter offering to sell the information he had obtained to the Soviet Union.

On April 3, 1957, he arrived in New York in an authorized leave status. He registered in a hotel in that city and then completed the letter by inserting the number of his hotel room and by changing certain dates. On April 5, 1957, he traveled to Washington, D. C., proceeded to the Soviet Embassy and tossed the letter, wrapped in a newspaper, behind an iron fence on the Embassy grounds. On the same day he returned to New York City, and, upon arrival, he removed the classified documents from his hotel room and placed them in a locker in a railroad station. Also on that same date, two agents of the Federal Bureau of Investigation saw the rolled newspaper on the Embassy grounds and retrieved it, whereupon the letter was discovered.

On the following day, April 6, an agent of the Federal Bureau of Investigation, accompanied by an agent of the Air Force Office of Special Investigations, knocked on the door of the accused's hotel room. He admitted them, but the agents did not reveal their identities at that time. The FBI

agent informed the accused he had been asked to pick up some drawings and exhibited the accused's letter as his means of identification. The accused stated the documents were at his home in Puerto Rico but, if he were given some money, arrangements could be made for their delivery. He indicated on a memoradum pad the nature of the drawings he had and, during the conversation, the FBI agent stated he had sufficient money with which to pay for the documents.

A stalemate was reached when the accused wanted money without producing the documents, and the FBI agent would not pay without obtaining possession of them. At this point, both agents displayed their credentials. Thereupon the accused said, "I knew it, this is it." He then gave his written consent to the FBI agent to search the hotel room. The written consent shows that the accused was advised of his constitutional right not to have a search made of his room without a search warrant and that he authorized the seizure of any letters or other property desired. After again being advised of his right, he then gave another written consent to a search of the locker. This search resulted in the seizure of the classified documents.

Three of the six documents were classified "Restricted Data" within the purview of section 224 of the Atomic Energy Act (act of August 1, 1946, ch 724, 60 Stat 755, as added by the act of August 30, 1954, ch 1073, 69 Stat 958, 959, 42 USC 2274(b)). The others required the classification "Confidential," as either not restricted data or as formerly restricted data. The accused had no authority to transmit any of the six documents to a foreign government.

The accused made three extrajudicial oral confessions. The first was given to the FBI agent in the hotel room on April 6, 1957. He made the other two confessions to representatives of the Office of Special Investigations, one on April 8, 1957, at Mitchel Air Force Base, New York, and the other on July 25, 1957, at Barksdale Air Force Base, Louisiana. The last was obtained as the result of accused's specific request for an interview with the OSI. The three confessions cover all the elements of the offenses of which the accused has been convicted.

Our problem will be greatly simplified if we first dispose of the assignments of error raised by the accused as the answer to the first issue is largely dispositive of the question certified by The Judge Advocate General.

II

Accused's first assignment of error challenges the jurisdiction of the court-martial to try him for the offense set forth in specification 1, which he contends charges a violation of the espionage laws of the United States. The basis of the challenge is that the specification states a capital offense and, under the provisions of Article 134, Uniform Code of Military Justice, offenses carrying a death penalty are not subject to being charged as violations of that Article. It provides as follows:

"Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court."

It is to be observed that crimes proscribed by that Article may fall within one or more of three separate categories: (1) Disorders and neglects to the prejudice of good order and discipline in the armed forces; (2) conduct of a nature to bring discredit upon the armed forces; (3) crimes and offenses not capital. The crucial question which must be resolved is whether the specification under consideration alleges an offense which is barred by subsection (3). It is the contention of the accused that the crime is pleaded as a violation of the latter subsection and that, because the offense is capital, the court-martial was without jurisdiction to try

this particular offense. The Government takes the position that the specification charges serious military misconduct which brings discredit on the armed forces, and can be supported under subsection (2) of the Article. The specification, insofar as material to this issue, reads as follows:

"In that CAPTAIN GEORGE H. FRENCH, United States Air Force, 4230th Patients Command Section, 4230th USAF Hospital, Barksdale Air Force Base, Louisiana then of the 60th Bombardment Squadron, Heavy, 72d Bombardment Wing, Heavy, having reason to believe it would be used to the advantage of a foreign nation, to wit: the Union of Soviet Socialist Republics, did, in the City of Washington, District of Columbia, and the City of New York, New York, during and about the period 5 April 1957 to 6 April 1957, wrongfully and unlawfully attempt to communicate information relating to the national defense of the United States contained in six documents more particularly indentified as follows:

· · · · · ·

[Description of documents]

to a foreign nation, to wit: Union of Soviet Socialist Republics, or to representatives, officers or agents thereof."

We agree with the board of review that the specification states an offense which is rooted in criminal ██ misconduct of a nature to bring discredit upon the Air Force, but we disagree with its conclusion that subsection (2) can be used to support the court-martial's jurisdiction over the offense. We reach that decision because we believe the history and construction of Article 134 compel a holding that Congress intended not to permit the prosecution of any capital offense in a military court under any guise except when specifically authorized by statutory enactments (cf. Lee v Madigan, 358 US —, 79 S Ct —, 3 L ed 2d 260) (January 12, 1959), and that the allegations of specification 1 cause this particular offense to fall in that class.

It is conceded by the parties that "the

crimes and offenses not capital" portion of the Article finds its roots in the British military law (Articles of the Earl of Essex, 1643; Article 64 of the Code of James II, 1686). At the latter date the law, as it is set forth at page 928 of Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, read:

"All other faults, misdemeanours and Disorders not mentioned in these Articles, shall be punished according to the Laws and Customs of War, and discretion of the Court-Martial; Provided that no Punishment amounting to the loss of Life or Limb, be inflicted upon any Offender in time of Peace, although the same be allotted for the said Offence by these Articles, and the Laws and Customs of War."

Article of War Fifty of 1775, a precursor statute to Article 134, as it is set forth in Colonel Winthrop's treatise, supra, at page 957, provided as follows:

"All crimes, not capital, and all disorders and neglects, which officers and soldiers may be guilty of, to the prejudice of good order and military discipline, though not mentioned in the articles of war, are to be taken cognizance of by a general or regimental court-martial, according to the nature and degree of the offence, and be punished at their discretion."

The difference in wording between the British and American law is of some importance. As we interpret the quoted English Article, the question of jurisdiction over offenses was not involved for the proscription applied only to the sentence, while the Article of War denies to American military courts jurisdiction to entertain capital cases under what has become known as the general Article.

If we consider the statutes at the time they were passed and we take into account the conditions facing the framers of the Articles of War, we reach this conclusion. Military courts were denied the power to impose a death sentence except in those instances where it was specifically authorized. The general Article was broad enough to cover any impropriety of conduct and because it provided for trial and punish-

ment of every conceivable military offense not specified in any other Article, an exclusion based on the gravity of punishment was written into the law. That is, the catch-all Article could not be used to charge and try offenses which had been made capital by the laws of the United States. The phrases "all crimes not capital" and "are to be taken cognizance of" when considered together must be interpreted to mean that criminal conduct made punishable by death cannot be made the basis for a charge under a general Article wherein the specific acts of misbehavior proscribed are not defined.

In Colonel Winthrop's Military Law and Precedents, supra, page 721, we find the following statement which bears out a construction of the American Article of War consonant with the one we adopt:

" 'Not Capital.' The Article, by these words, expressly excludes from the jurisdiction of courts-martial, and, by necessary implication, reserves for the cognizance of the civil courts, (in time of peace,) all capital crimes of officers or soldiers under whatever circumstances committed—whether upon or against military persons or civilians. By capital crimes is to be understood crimes punished or made punishable with death by the common law, or by a statute of the United States applicable to the case,—as, for example, murder, arson, or rape.

"The exclusion being absolute, the capital crime, however nearly it may have affected the discipline of the service, cannot be any more legally adjudicated indirectly than directly. A court-martial cannot take cognizance of a case of homicide charged as 'manslaughter' or otherwise when the averments of the specification set forth a case of murder. So where, the specification being incomplete or ambiguous, the evidence on the trial shows the act thus charged, or charged as 'conduct to the prejudice,' &c., to have been in fact a murder, the court should refuse to proceed, or, if it assume to do so and to find or sentence, its proceedings should be disapproved as coram non judice and void in law."

Courts-martial are courts of limited jurisdiction and have only the powers delegated to them by Congress. It has jealously restricted their jurisdiction to try capital cases and imposition of the death penalty has never been permitted unless specifically authorized by law. It was not until 1863 that general courts-martial were given the power to impose the death penalty for the civilian capital offenses of murder and rape, and then only during wartime. 12 Stat 736. Until the Uniform Code of Military Justice became effective, military courts were prohibited from trying those offenses if committed within the geographical limits of the States and the District of Columbia in time of peace. It would thus appear that prior to 1950, offenses which carried the death penalty and which were common to both the military and civilian communities could not be tried by military courts during time of peace. Moreover, Articles 18 and 52 of the Uniform Code of Military Justice, 10 USC §§ 818 and 852, unquestionably deny to general courts-martial the power to impose the death sentence except when specifically authorized by the Code.

From the foregoing, it is crystal clear that the prosecution cannot rely on subsection (3) of Article 134 to support the court-martial's jurisdiction. But, says the Government, this offense was pleaded and tried under subsection (2) of the Article. That is the approach taken by the board of review and, up to a certain point, we follow its reasoning but, if pursued to its ultimate conclusion, it permits the Government to proceed indirectly when it is barred from advancing directly. Unquestionably, the offense as alleged falls in that second category of crimes and, of course, the Government may elect to base its charge on any one of the three classes, provided—and this is the place where we disagree with the board—there is not some other statute which prevents using the category as a base for the prosecution. Statutes should not be construed to bring about undesirable results, and

**177**

it must be conceded that the phrase "crimes and offenses not capital" should, if possible, be interpreted so that the military services are not powerless to take criminal disciplinary action when a person subject to military law commits acts which in effect amount to peacetime espionage. But it is not conceded the Government may allege the most serious aspect of that offense and escape the force and effect of subsection (3) by merely stating it treated the offense charged as noncapital. Neither is it conceded that the Government is limited to pleading this particular offense as a mere disorder. Certainly specification 3, quoted infra, which alleges all the elements of a violation of § 2274 (b) of the Atomic Energy Act, 42 USC § 2274, charges an offense under either subsections (2) or (3) of the Article, and it does not offend against the proscription of the latter subsection, for the maximum imposable sentence is ten years' confinement with accessories. To illustrate the point, aside from the "Restricted Data" consideration, the principal difference between the Espionage Act and the Atomic Energy Act is that the former requires that the information concern the national defense of the United States, which the latter does not. Had specification 1 not alleged that particular element, there would have been no question about it properly stating an offense and not offending against any provision of the Code.

From the foregoing premises, we move on to present our construction of Article 134. As a starting point, we reiterate that Congress has denied to military courts the power to try capital offenses which are civilian in nature and which can be tried by civilian courts. With that limitation in mind, we apply the general rule ▬▬▬▬▬ ■ that statutes must be interpreted, when possible, to carry out the purposes intended and to give force and effect to all the words and phrases. If we were to accept the construction contended for by the Government, we would be required to disregard the limitations placed on military courts and close our eyes to subsection (3). That clause has reference to a category of crimes which have been denounced by Federal statutes but which do not carry the death sentence. Crimes which permit the imposition of that penalty are excluded. We know of no offense that carries such serious maximum punishment which, if committed by one subject to the Code, could not bring discredit on the armed services. Accordingly, if we were to say that an offense made punishable by death can be alleged and tried under subsection (2), we would render meaningless subsection (3), for every capital offense could then be tried by military courts merely by asserting it was discrediting to the service.

At this point, we seek to clarify one thought in our process of reasoning. In order that a crime may be ▬▬▬▬ ■ tried and sentence imposed, ▬▬▬▬ ■ it is necessary that the ▬▬▬▬ ■ court-martial have jurisdiction over the offense. Jurisdiction to try a crime is derived only from the law and in military courts whether the offense is one which may be tried must be determined from the four corners of the specification. If jurisdiction depends upon the severity of the punishment which may be imposed, the Table of Maximum Punishments is not applicable, as the jurisdictional limits are fixed by the statute prohibiting the crime. And because Article 134 does not expressly authorize the death penalty, any offense charged under it would of necessity be a noncapital case in the military hierarchy, even though it were capital in the civilian sphere. Articles 18 and 52 of the Code, supra. Therefore, if we did not use the specification as a measuring rod for jurisdiction, it would necessarily follow that the military services could try every offense made capital by Congress, even though not specifically authorized to do so by the Code, provided the charge was laid as a violation of Article 134. That construction would also render subsection (3) meaningless and would widen the sweep of military jurisprudence beyond the intent of Congress and the limitations of the Code.

In light of the time and circumstances under which Congress enacted the precursor statutes to Article 134, we believe that body intended to erect an ab-

solute barrier against military courts trying peacetime offenses which permitted the imposition of the death penalty in civilian courts. Apparently the legislative department of the Government intended that category of crimes should be tried before a civilian court and jury under civilian rights and privileges. If we are certain in that regard, then it is positive that this case falls under the bar for if the specification as herein alleged was pleaded as one charge in an indictment, a conviction would permit the imposition of a death penalty by a Federal civilian judge. Following this hypothesis one step further, if an indictment was returned which did not include an allegation that the information related to national defense, then only a ten-year penalty could be imposed and the case would not be capital.

We are not impressed with the argument that the construction we adopt would bring about absurd results and thus violate a canon of statutory construction. For purposes of argument, we accept the contention that it would be ridiculous if a member of an armed force was engaged in espionage activities on foreign soil and could not be prosecuted. The short answer, of course, is that he could. If the espionage statute which authorizes the death penalty is not effective except within the continental United States and on the high seas, then the services are not confronted with the bar erected by subsection (3) of Article 134, for the only reason for its applicability is that Congress has prescribed that, in the area where civilian courts can operate, the offense is capital. The statute is non-effective outside that area and, absent the obstacle of the death sentence, the crime could be tried in military courts. For many years under the law (see Article of War 92) a similar rule obtained for the crimes of murder and rape and no undesirable consequences have resulted.

Part of the difficulty encountered in this case arises from the necessity of having to determine the intent of Congress from the wording of several criminal statutes, together with their subsequent amendments. Where a particular act is amended, it may affect the practical application of other statutes. No difficulty would have been encountered in this case had the offense been committed prior to the year 1954. Before that time a peacetime violation of the Espionage Act did not permit the imposition of a death sentence. However, in that year Congress changed the maximum penalty and authorized capital punishment. We do not believe that by so doing it intended to deny to military courts their power to try members for criminal conduct which is inimical to the successful operation of the armed services. But this is not to say it did not intend to exclude from prosecution in military courts criminal misconduct which, if proven, could be punished by death. Congress most certainly changed the offense from the category of non-capital to capital crimes and did not express any intent to broaden the powers of courts-martial with respect to their jurisdiction to try capital crimes. By increasing the punishment and by not specifically authorizing trial by courts-martial of those violators who are subject to military law, Congress fixed the trial of peacetime violators of the Espionage Act in its most serious aspect, if committed within the confines of the United States or on the high seas, beyond the pale of military courts.

We need say little about the actual wording of the specification alleging an offense made capital by Congress. Significantly enough, it follows the wording of the statute prohibiting espionage activities and it alleges every element of that offense. Moreover, it was tacitly admitted by trial counsel that the theory of the prosecution was that the specification undoubtedly alleged a violation of that statute. He, however, asserted that fact was unimportant because the prosecution could proceed on a theory that subsection (2) would support the charge and, even though a capital offense was alleged, the law governing those cases would not apply. On appeal this theory has been the core of the Government's contention, and so the only real question involved is the one we have previously discussed.

Lastly, on this issue the Government

contends the findings can be sustained on the theory that Article ▋ 133 of the Code, 10 USC § 933, proscribes the acts herein alleged. The argument proceeds on the hypothesis that the exclusionary clause found in Article 134 does not apply to the Article proscribing conduct unbecoming an officer and gentleman. At the trial level, trial counsel suggested this alternative approach and asked for permission to amend if the law officer concluded trial of the offense as alleged was barred. This request was never ruled on for the reason the law officer ruled that the Government could proceed under Article 134. The accused contends that for us now to permit the Government to change its theory would prejudice him as he would defend differently. We need not answer this assertion, as we believe that for this purpose an officer is in the same class as an enlisted man. Until at least 1874, the general Articles specifically mentioned both officers and enlisted men, and capital offenses were barred regardless of rank or grade. Winthrop, supra, states that the Article excludes from jurisdiction of courts-martial and by necessary implication reserves for the cognizance of civil courts, in time of peace, all capital crimes of officers and enlisted men. While the predecessor statutes of Article 133 made dismissal mandatory, the officer could be charged and convicted under the Article denouncing conduct unbecoming an officer and the general Article. If convicted under the latter, the punishment imposable was greater than the former as it could include confinement, fines, and forfeitures. It would indeed be importing inconsistency into the law to hold that a capital offense could not be tried under one Article but it could be under the other. And, certainly, if we are correct in our conclusion that a court-martial does not have jurisdiction to try capital cases in time of peace except in those instances where express provision therefor is specifically made, then the first specification is barred, regardless of its underlying Article.

For all of the foregoing reasons, we conclude the court-martial did not have

jurisdiction of the offense alleged in the first specification.

### III

Our holding on the first issue answers the question raised by the second assignment of error which asserts that the law officer erred in his instruction on the maximum sentence. Obviously, if the court-martial had no jurisdiction to consider the capital offense, the law officer's instruction to the effect that life imprisonment was the maximum punishment imposable was erroneous. No other specification permitted confinement for more than ten years and so the court was furnished an improper yardstick. However, that is the beginning of the inquiry and not the end. The board of review considered the question of multiplicity and reached the conclusion that the accused's misconduct was a single violation for purposes of determining the appropriateness of punishment and reassessed the sentence on that basis. It further decided that the maximum set by Congress for violation of the Atomic Energy Act was ten years' confinement and that the specification alleging that offense would set the ceiling on the punishment. While it found that ten years' confinement was appropriate, there is no uncertainty about the fact the board of review believed the maximum was woefully inadequate. Its finding of appropriateness was based solely on the limitations found in the Federal statute. We, therefore, conclude that this question has been passed on by an agency with power to determine appropriateness. Furthermore, we find no reason in law to disagree with the decision of the board of review and, as will hereinafter be further developed, we conclude any error in this regard has been purged and no good purpose would be served by returning the record for further consideration of the sentence.

### IV

The next issue raises a question of whether the law officer erred in overruling the defense motion for disclosure of an alleged Government informant. The facts necessary to a disposition of

this issue are these: A Federal Bureau of Investigation agent testified he and another agent were in the the vicinity of the Soviet Embassy in Washington, D. C., on April 5, 1957, because of information furnished by confidential sources. The defense sought to determine the identity of any informant or informers but acting pursuant to Department of Justice regulation No. 3229, the agent refused to divulge any further information in regard to the source. Trial defense counsel's contention was that a disclosure of the Government informant was essential to the defense but, after weighing the respective assertions of the parties, the law officer ruled that disclosure was unnecessary. Under the facts of this case, we agree.

Communications made by informers to public officers engaged in the discovery of crimes are normally privileged, Manual for Courts-Martial, United States, 1951, paragraph 151$b$; United States v Hawkins, 6 USCMA 135, 19 CMR 261, but the identity of an informant must be made known where it is essential to the defense. The recent case of United States v Roviaro, 353 US 53, 77 S Ct 623, 628, 1 L ed 2d 639, states the doctrine in the following language:

"A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.

. . . . . .

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."

We find nothing in the record which remotely suggests that the accused was denied information which could possibly be helpful to his defense. One of the agents of the Federal Bureau of Investigation who retrieved the accused's letter from the Embassy property was a witness at the trial. It was not shown that he was in any way aided or abetted by anyone who knew of accused's plan to commit the offense. Moreover, the record does not show whether the information he obtained from the confidential sources identified the accused but, assuming it did, in the accused's pretrial statements he denied anyone was involved with him in his activities, and the record is barren of any evidence which is contrary to the evidence furnished by those statements. Under that state of facts, assuming there was an informer, he could have testified only to the facts that accused was in the vicinity of the Embassy and threw a paper over the fence. The accused had made a full confession of those matters and in the light of his own admissions we are unable to ascertain how the knowledge sought by him would be material to his defense. We may take judicial notice of the "cold war" conditions which are presently existing between the United States and Russia, and disclosure of some activities of counterespionage agents could be detrimental to our national defense. The problem is one which calls for balancing the public interest in protecting the flow of information, against the accused's right to prepare his defense, and the scales in this instance are overweighted heavily in favor of the Government.

From all of the foregoing, it is apparent the accused has failed totally in presenting any reason why the Government's source of information should be disclosed. Accordingly, we find no reason to rule that the privilege must yield.

## V

The next assignment of error will not

detain us long. In it accused contends that certain prosecution ex- hibits, namely, the re- stricted documents, were obtained as the result of an illegal search and seizure, and the law officer erred in admitting them into evidence. The record shows that the FBI agent and the OSI agent entered the accused's hotel room pursuant to invitation. After their entry and some discussion concerning the sale of the classified material, the agents disclosed their true purpose. The accused immediately realized his predicament and, without coercion or illegal inducements, he freely consented to the search of his hotel room and the locker in a railroad station. This consent was given after he had been fully advised of his right not to have a search conducted without a search warrant unless he voluntarily consented thereto. A search made with the consent of the person whose property is searched is not unlawful, but acquiescence or mere submission to authority are not equivalent to consent, and will not suffice to legalize an otherwise unlawful search. See United States v Wilcher, 4 USCMA 215, 15 CMR 215, and cases therein cited. But we are not confronted with that situation in the case at bar for here the record shows much more than mere submission to Federal authorities. It shows beyond peradventure that consent was freely given, and this makes the search and seizure reasonable. See paragraph 152, page 288, Manual for Courts-Martial, United States, 1951.

Our holding that the search was legal disposes of the related issue which has to do with the asserted in- voluntariness of the accused's pretrial statements. Defense objected to their admission in evidence on the grounds that they were the direct product of an illegal search and seizure. No other testimony raised an appellate issue of involuntariness or failure to warn. It, therefore, follows that if the search and seizure were reasonable, the admission of the documents was proper.

## VI

The next assignment of error is pred-

icated upon the grounds that the court did not have jurisdiction of the offenses alleged in specifications 2 and 3 of the Charge. The argument is bottomed upon the assumption that specifications 2 and 3 allege violations of the Atomic Energy Act of 1954, 42 USC § 2274(b) and that prosecution is barred for failure of the prosecution to comply with § 2271(c), which provides:

"No action shall be brought . . . for any violation under this chapter unless and until the Attorney General . . . has advised the [Atomic Energy] Commission with respect to such action and no such action shall be commenced except by the Attorney General of the United States: *Provided, however*, That no action shall be brought under sections 2272–2275 or 2276 of this title except by the express direction of the Attorney General."

The clear import of this section coupled with the history and background of the reasons and purposes for enacting the Atomic Energy statutes leads us to the conclusion that Congress intended to require the approval of the Attorney General as a condition precedent to actions brought in Federal civilian courts but not as to those tried in military courts. Congress has always recognized the power of military courts to punish members of the armed forces for violations of law which have a direct impact on the successful preparation for and conduct of military operations. Likewise the Supreme Court has consistently viewed military law as being separate and distinct from civilian law. Therefore, unless there was a clearly expressed indication on the part of Congress to blend the two together and superimpose the Attorney General over military prosecutions the two should remain separate. We find no such expressed intent and accused's acts were most certainly in violation of military law. The basic charge against him was founded on conduct which brought discredit upon the Air Force. His misbehavior was a violation of subsection (2) of Article 134 without regard to the provisions of the Atomic Energy Act. Even had Congress not enacted

that legislation, the military arm of the Government could have maintained the present action against the accused because of the service-discrediting nature of his misbehavior. As previously indicated, his conduct was infamous and disgraceful, and no right-thinking person would contend it was not inimical to the defense of this country. Congress has seldom, if ever, required the armed forces to clear prosecution of military crimes with the Attorney General, and we see no compelling reason expressed in the Atomic Energy Act or elsewhere to place violations of that act in a category distinct from other Federal offenses. On the contrary, we find at least one straw in the wind which shows the restriction was imposed only for the benefit of civilians. Page 24, Senate Report No. 1251, 79th Congress, 2d Session, 1946, indicates that the language was included "as an assurance to scientists working in atomic energy fields that prosecutions would not be initiated without review by persons having the technical and scientific background necessary to determine the significance of the acts complained of." That purpose would have no application to the military aspect of the crime. Moreover, while the proof furnished by the Government showed a violation of the Atomic Energy Act, it also established a breach of Article 134. The specification did not specifically charge a violation of a particular act, and the prosecution did not proceed under civilian law. From beginning to end, this prosecution has been bottomed on a violation of military law, and the civilian statute was used only to protect the accused on the maximum sentence. Accordingly, we conclude the court-martial had jurisdiction to try the offense alleged in the two specifications without regard to the consent of the Attorney General.

## VII

The accused has advanced certain other assignments of error which we have carefully considered but overrule without discussion. They are either answered by our disposition of the issues previously considered, they have been the subject of recent decisions, or they are not deemed of sufficient importance to justify separate treatment.

## VIII

The Judge Advocate General of the Air Force certified the following question to us for answer: Was the board of review correct in holding as a matter of law that the maximum sentence imposable was dismissal, total forfeitures, and confinement at hard labor for ten years? Our holding on the first issue disposes of the most important facet of the certified question, namely, that life imprisonment is not assessable. That leaves for determination whether the remaining specifications are multiplicious for sentencing purposes as found by the board of review. We are constrained to hold that the board of review was correct.

In arguing this proposition, the Government has advanced the theory that under the elemental test the alleged offenses are separate and can be severally punished. The accused takes the opposite position and asserts that this case is controlled by the rule announced in United States v Brown, 8 USCMA 18, 23 CMR 242. The question is not without difficulty, but we conclude that the test to be used in this case is more akin to the one announced in United States v McVey, 4 USCMA 167, 15 CMR 167, than it is to those found in other decisions. What we deem as the most serious charge is accused's attempt to communicate restricted data to the Union of Soviet Socialist Republics. That offense was alleged in specification 3 and in the interest of clarity we quote its relevant parts:

"In that CAPTAIN GEORGE H. FRENCH, United States Air Force, 4230th Patients Command Section, 4230th USAF Hospital, Barksdale Air Force Base, Louisiana, then of the 60th Bombardment Squadron, Heavy, 72d Bombardment Wing, Heavy, having possession of documents involving and incorporating 'Restricted Data' within the meaning of the laws of the United States, more particularly identified as follows:

• • • • •

**183**

[Description of documents]

and having reason to believe the documents to be so communicated would be utilized to secure an advantage to a foreign nation, to wit; the Union of Soviet Socialist Republics, did willfully, at the City of Washington, District of Columbia, and the City of New York, New York, during and about the period of 5 April 1957 to 6 April 1957, attempt to communicate the documents described above to representatives of the Union of Soviet Socialist Republics, a foreign government, whose names are unknown, and whom he, the said CAPTAIN GEORGE H. FRENCH, requested the Embassy of the Union of Soviet Socialist Republics in the City of Washington, District of Columbia, to designate."

Specification 2 in substantially the same terms alleges that accused, at the Embassy, offered to sell the documents. And the fourth specification alleges the accused, without authority, delivered to the premises of the Embassy of the Union of Soviet Socialist Republics a letter offering to sell to agents of that country information relating to the national defense of the United States.

The proof shows a single transaction to communicate the information contained in the documents to the Union of Soviet Socialist Republics for a stated consideration. In its totality the scheme covered sufficient time to effectuate a sale. However, the offense with which we are concerned is the attempt to communicate restricted data. The Manual for Courts-Martial, United States, 1951, paragraph 159, discusses an attempt as follows:

"To constitute an attempt there must be a specific intent to commit the particular offense accompanied by an overt act which directly tends to accomplish the unlawful purpose. The overt act must be more than mere preparation to commit the offense. Preparation consists in devising or arranging the means or measures necessary for the commission of the offense. The overt act required goes beyond preparatory steps and is a

**184**

direct movement towards the commission of the offense. However, the overt act need not be the last proximate act to the consummation of the offense attempted to be perpetrated."

In this attempt to communicate, the overt act was throwing the letter containing the offer to sell over the fence at the Embassy, for at that point the accused had gone beyond forming the specific intent to impart information to a foreign sovereignty. To make that act the base for separate punishment would be in effect making each outward manifestation of the intent a complete and separate crime. In United States v McVey, supra, we were faced with a somewhat analogous situation as the force and violence element of robbery was held to be merely an ingredient of that offense. We there considered the elemental test and held that, even though when strictly interpreted, it might be applied, it was inappropriate in a setting where the pleadings and proof merged the assault element into the greater offense. Here we are presented with a problem where the specifications and the evidence adduced in support thereof show the throwing of the letter was the overt act of the major crime of attempting to communicate. Thus, assuming arguendo that the delivery of the letter might under some circumstances be a separate offense, here we conclude it merges with the more serious crime.

One other hypothesis bears scrutiny. In the case at bar, all three specifications are alleged in violation of a single statute. The base for those charges is subsection (2) of Article 134, which proscribes conduct bringing discredit on the military. It appears to us that when a transaction is alleged in violation of that clause, an accused would truly be twice punished for the same offense if his alleged and proven overall plan was punished for its discrediting effect and then the plan was broken down into divisible parts and each successive step which goes to make up the whole was used to support a finding of a separate offense with its concomitant punishment. While it is true the accused had completed his attempt when he tossed the written offer over the

fence, the subsequent acts were merely part and parcel of a single attempt to sell the restricted data. It, therefore, seems appropriate and consistent to hold that we have a combination of overt acts which formed part of a single transaction and that only the maximum sentence permissible for the completed performance should be imposed. Accordingly, the board of review's resolution of this issue is affirmed.

## IX

Because of our holding on the first specification, we are confronted with the alternatives of either ▮▮▮▮▮ affirming the board of review sentence or returning the record to a new trial forum for reimposition of sentence. We are not at all uncertain about the course we should take in the interest of justice. At the trial level, the members of the court-martial were instructed that the maximum sentence imposable was confinement for life. The acts of the accused were disloyal and infamous in the extreme. His plan, had it succeeded, would have betrayed his country and given comfort and aid to those who seek to undermine our form of government. Had he been convicted by a civilian court of the acts alleged, he could have suffered the death penalty. It is no wonder then that he received the maximum sentence imposable under the instructions of the law officer. When his fate was decided by the board of review, it was with the greatest reluctance on their part that the members affirmed only what was legally permissible, that is, a sentence including ten years' confinement. Boards of review have power to reassess sentences in the light of the entire record and when they use the correct measuring rod, we are not compelled to interfere. Our dismissal of the one specification does not change the despicable nature of accused's misconduct nor does it require use of a standard different from that employed by the board in determining the appropriateness of sentence. As we read the record, the accused should be grateful he was tried under military law, for it is our firm conviction it is not at all unlikely he would have suffered greater punishment had he been tried by a forum where the death penalty could have been imposed. The United States Supreme Court in Jackson v Taylor, 353 US 569, 77 S Ct 1027, 1 L ed 2d 1045, and Fowler v Wilkinson, 353 US 583, 77 S Ct 1035, 1 L ed 2d 1054, has affirmed our holdings that an accused is not, as a matter of law, entitled to a rehearing on sentence when a board of review has affirmed a sentence based on a reduction of charges. While in certain instances where there has been a great disparity between the seriousness of the offenses considered by the court-martial and those affirmed by reviewing authorities, we have determined that, in the interest of justice, a redetermination should be made by the court-martial, we find nothing in this record which brings the accused under that rule. On the contrary, we note that even though the board of review affirmed accused's conviction of specification 1, it held that the four offenses constituted but a single crime for purposes of punishment. Thus, they reassessed sentence upon the basis of a single finding of the transaction in its most serious aspect, viz: one violation punishable, inter alia, by confinement for ten years. And even though we reverse one specification for lack of jurisdiction, still, for sentence purposes, the exact situation obtains at this level—punishment may be imposed only upon the basis of a single violation for which ten years' imprisonment may be imposed. Manifestly, then, the board of review has already assessed an appropriate sentence utilizing the correct standard. Since the board in doing so acted well within the powers conferred upon it by Congress, we conclude that a reference of this case back to either a court-martial or a board of review would be an empty ritual which, under the law, we are not required to perform.

Accused's conviction of the offense alleged under specification 1 is set aside and that specification is dismissed, but otherwise the decision of the board of review is affirmed. The certified question is answered in the affirmative.

QUINN, Chief Judge (concurring in the result):

I have reservations about a number

**185**

of statements in the principal opinion. However, I agree generally with the discussion in subdivisions IV, V, VI, and VII. As to point I, in my opinion, the board of review is correct in its conclusion that, notwithstanding similarity of language between the allegations of the specification and the provisions of the Espionage Act, the specification sets out conduct to the discredit of the armed forces in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. See Rosenberg v United States, 346 US 273, 73 S Ct 1152, 97 L ed 1607; Pietrzak v United States, 188 F2d 418 (CA5th Cir) (1951). In view of the discretionary action taken by the board of review to correct what it believed to be an error in the instructions on the sentence, I think it is unnecessary to consider the contentions regarding the maximum sentence. I would, therefore, affirm the decision of the board of review.

FERGUSON, Judge (concurring in the result):

I concur in the result. Although I find myself in general agreement with most of the principal opinion, my concurrence is limited because of a few choices of language which I deem unfortunate and because I disagree in part with the treatment accorded Point VI. I agree the convictions under specifications 2 and 3 are sustainable under the second subsection of Article 134, Uniform Code of Military Justice, 10 USC § 934, as conduct of a nature to bring discredit upon the armed forces. I note, too, that the law officer gave proper instructions on this element. However, it is my view that the intent of Congress is made clear by the statute and that if the actions of accused were alleged as a violation of the Atomic Energy Act and charged under the third subsection of Article 134 of the Code, supra, as a crime not capital, the provisions of 42 USC § 2271(c) would need to be complied with even though trial is in the military courts.