UNITED STATES, Appellee

v

ROY A. RHODES, Master Sergeant, U. S. Army, Appellant

11 USCMA 735, 29 CMR 551

No. 13,242

Decided August 5, 1960

*Lieutenant Colonel John F. Hummel* argued the cause for Appellant, Accused. With him on the brief were *Major Edward Fenig* and *First Lieutenant Ira M. Lechner.*

*First Lieutenant Francis J. Larkin* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy, First Lieutenant Avram G. Hammer,* and *First Lieutenant Wade H. Sides Jr.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Disclosures by a defected Russian spy led to an investigation which eventually resulted in the filing against the accused of two charges of conspiring to violate Federal statutes relating to the procurement and transmission to a foreign government of information about the national defense of the United States and of one charge of making a false official statement, contrary to the provisions of Articles 134 and 107, Uniform Code of Military Justice, 10 USC §§ 934, 907, respectively. A general court-martial convened by the Commanding General, Military District of Washington, convicted the accused of all charges and imposed a dishonorable

discharge, total forfeiture of pay and allowances, and confinement at hard labor for five years. The convening authority approved the conviction. On review before the board of review, the accused contended, and the Government conceded, that the conspiracy to violate Title 18 USC § 794 alleged in specification 1, Charge I, could not be tried by a court-martial as a violation of Article 134 because the Title 18 provision carries a death penalty. See United States v French, 10 USCMA 171, 27 CMR 245. The board of review set aside the findings of guilty and dismissed that specification. It also reconsidered the sentence, but concluded that notwithstanding its dismissal of specification 1, Charge I, the sentence was "appropriate." We granted further review to consider a number of questions presented by the record of trial.

Accused's principal assignment of error turns upon whether the former spy's testimony about a conspiracy in which he and other Russian agents were involved is the same as that in which the accused allegedly participated. The board of review "determined as a matter of fact that the conspiracy of which appellant was admittedly a member in 1953 and that to which Hayhanen [the defected spy] belonged were one and the same." Appellate defense counsel attack this finding upon three separate grounds. First, they contend the evidence is wholly insufficient to show that Hayhanen was engaged in a conspiracy. They concede that the evidence "unquestionably demonstrates that Hayhanen was involved in some suspicious business of a questionable nature," but they maintain it does not support the probability of a conspiracy to violate Title 18 USC § 793(c), which is the offense alleged in specification 2, Charge I. Later, we will recount some of Hayhanen's testimony; for the pres-

ent, it is sufficient to note—and it is conceded by the accused in his brief—that Hayhanen's testimony here is substantially like the testimony he gave for the Government in the prosecution of Soviet espionage agent, Colonel Rudolph Ivanovich Abel. United States v Abel, 258 F 2d 485 (CA 2d Cir) (1958), affirmed 362 US 217, 4 L ed 2d 668, 80 S Ct 683 (1960). There was "no dispute" in that case about the sufficiency of the evidence to prove the existence of the Abel conspiracy; and, in our opinion, there can be none here.[1]

Next, counsel contend that, assuming the existence of the Abel-Hayhanen conspiracy, there is insufficient independent evidence of the accused's connection with it to permit the admission in evidence of the accused's pretrial statements. The argument is based upon a supposed exception to the general rule that independent evidence of the identity of participants in a crime is not required as a condition for admission of a pretrial confession. See United States v Villasenor, 6 USCMA 3, 19 CMR 129. Judicial support for the alleged exception is sought in two cases. In United States v Hall, 25 CMR 874, an Air Force board of review said: "The nature of conspiracy, the crime of agreeing to accomplish an unlawful purpose by concerted action, similarly may necessitate proof of an accused's identity outside of his confession." The board of review, however, specifically indicated it was unnecessary to decide the question. The other case relied upon by counsel is United States v Mims, 8 USCMA 316, 24 CMR 126. That case is wholly inapposite. We there held that evidence of *possession* of narcotic instruments by one person does not provide the required independent evidence of *use* of narcotics by another to support the pretrial admission of *use* by the latter. A number of

[1] In the Abel case the Court of Appeals said: "It was largely from the testimony of Hayhanen, though there was evidence from other sources as well, that the jury learned of the appellant's activities in the United States. Although there is no dispute about the sufficiency of the evidence to prove con-

certed activity between Abel and others on behalf of the Soviet government, a brief résumé of the record developed at the trial will be useful to indicate the scope of the conspiracy which was proved and the means by which its purposes were to be accomplished." 258 F2d 485, 487 (CA2d Cir) (1958).

Federal cases clearly indicate the general rule, that independent ▮▮▮▮▮ proof of the identity of the perpetrator is not required, applies to a conspiracy prosecution. United States v DiOrio, 150 F2d 938 (CA 3d Cir) (1945) ; Ryan v United States, 99 F2d 864 (CA 8th Cir) (1938). These precedents have been followed by service appellate tribunals. United States v Bynaker, 2 CMR 186; United States v Coker, 13 CMR 459. We are not persuaded that it is either necessary or appropriate to carve out a special rule, requiring independent evidence of identity of a conspirator, as a predicate for the admission of a pretrial confession by him of his participation in the conspiracy. Cf. United States v Villasenor, supra; United States v Hemp, 1 USCMA 280, 286, 3 CMR 14. In any event, if independent evidence of accused's connection with the conspiracy is required, there is such evidence in the record of trial.

Probability, not certainty of guilt beyond a reasonable doubt, is all that is required to permit the ▮▮▮▮▮ admission of an extrajudicial admission of guilt. United States v Villasenor, supra. Hayhanen testified that he was a member of the Russian Intelligence with the rank of Lieutenant Colonel. After thorough training in cipher and code methodology, the use of special photographic techniques and other special techniques, and after a period of residence in Finland for the purpose of building a "background legend" as an American citizen, he was sent to the United States as an American citizen to do "espionage work"; that is, to obtain "secret information about military or other secret information." After his arrival he took up residence in New York and established contact with the "resident" Soviet agent, Colonel Abel, by appearing at special places wearing a blue tie with red stripes, and smoking or carrying a pipe. On one occasion, at Moscow's request, Abel and he went to Red Bank, New Jersey, to locate "Agent Quebec." The effort failed. As a result, Hayhanen sent a coded request to Moscow for more information. About a month and a half later, he received a coded message from Moscow to the effect that Agent Quebec was Roy A. Rhodes; that when in Moscow, Rhodes had told the Russians his parents lived in Howard, Colorado. The message directed Hayhanen and Abel "to locate Quebec through his relatives." Hayhanen checked the telephone directory for Howard, Colorado, in the public library. He found a listing for Rhodes. Afraid of arousing suspicion by a long distance telephone call, Hayhanen journeyed to Salida, Colorado, a town near Howard. He telephoned the Rhodes' residence and talked to the accused's sister. She told him Rhodes was in Tucson, Arizona. This information was relayed to Moscow. Hayhanen further testified that he received from Abel a microfilm containing information about Rhodes. After treating the film to make it "soft," he secreted it in a hollow bolt with removable screw-type head in his home in Peekskill, New York. The film and its container were obtained by agents of the Federal Bureau of Investigation, with Hayhanen's consent, from his Peekskill home, and were admitted as prosecution exhibits. Finally, Hayhanen testified that neither he nor Abel communicated with Rhodes. However, Abel planned to go to Moscow via Mexico and he said he would contact Rhodes en route. He did not do so; but he did go to Moscow and when he returned he told Hayhanen that "they insisted on contacting Agent Quebec."

Appellate defense counsel contend that Hayhanen's testimony does not connect the accused with the conspiracy. "Undoubtedly," their argument runs, "Hayhanen has made many innocent telephone calls to the homes of countless individuals inquiring as to their whereabouts." They characterize all the evidence as constituting merely "extrajudicial declarations" of alleged co-conspirators which are legally insufficient to establish the participation of the accused. See Montford v United States, 200 F2d 759 (CA 5th Cir) (1952); Kuhn v United States, 26 F2d 463 (CA 9th Cir) (1928). The difficulty with defense counsel's argument is that Hayhanen's testimony is not as colorless as they conceive it to be. It

has definite significance. The conduct and attitudes of known ▬▬▬ █ conspirators in an established conspiracy toward a third person have probative value in determining whether the latter is connected with the conspiracy. See Hogan v United States, 48 F2d 516 (CA 5th Cir)(1931); Kanner v United States, 34 F2d 863 (CA 7th Cir)(1929). Such evidence may not be sufficient to establish beyond a reasonable doubt that the accused has some connection with the conspiracy, but it shows at least a probability of such connection. Kanner v United States, supra, page 866. Indeed, it has been said that only slight evidence is necessary to establish the participation of a particular conspirator in a proven conspiracy. Phelps v United States, 160 F2d 858 (CA 8th Cir)(1947); Meyers v United States, 94 F2d 433, 434 (CA 6th Cir)(1938). Proof of the probability of identity need go no further. We are thus brought to the third and final aspect of the accused's challenge to the sufficiency of the evidence. This argument proceeds on the premise that even considering the accused's pretrial statements, the evidence does not support the conviction, because the conspiracy involving Hayhanen and Abel is separate and distinct from the criminal agreement disclosed by the accused in his pretrial statements. If that contention is correct, there is either no independent evidence to corroborate the accused's statements, or there is a fatal variance between the pleading and the proof. Kotteakos v United States, 328 US 750, 90 L ed 1557, 66 S Ct 1239; Montford v United States, supra.

Relying upon such cases as United States v Johnson, 65 F Supp 46 (MD Pa)(1946), and United States v Peoni, 100 F2d 401 (CA 2d Cir)(1938), appellate defense counsel maintain that the accused is not chargeable with the conduct of Abel and Hayhanen unless their conduct comes within the reasonable intendment of the accused's agreement with the Russians. Rhodes' agreement, they say, was not to engage in espionage but merely to pass on "gossip" and "rumor" about the personal habits of personnel in the American Embassy in Moscow. Hayhanen and Abel, the argument continues, "never conspired in regard to the subject matter of Rhodes' activity"; but they were concerned with military and atomic secrets. The argument is founded on much too narrow a reading of the accused's statements to the Federal Bureau of Investigation agents; his testimony in the Abel trial, which was admitted in evidence here; and Hayhanen's testimony. We will not attempt to compress all of the relevant evidence into this opinion. Suffice it to recount so much of the evidence as, in our opinion, supports the findings of the court-martial, and the board of review, that the accused was part of the same conspiracy as Abel and Hayhanen.[2]

According to the accused, he was assigned to duty in the American Embassy in Moscow, Russia, from April 1951 to July 1953 as head mechanic in the Embassy garage. About December 1951, he became involved with a Russian girl. The involvement led to an association with a man known to the accused as "Bob Smith" or "Bob Day," apparently a Russian who spoke "excellent English." At one of his meetings, Bob proposed to the accused that he "go to work for them"; he did not specify "who they were." The accused indicated he "had no information," but he nonetheless accepted money from Bob when they separated. About three months later, Bob called the accused and arranged a meeting with him. He took the accused to an apartment at which four men were present; three

---

[2] The accused contends that certain rulings in the Abel case in regard to his testimony show there were two separate conspiracies. The contention is based upon the fact that in the Abel case his testimony was offered and admitted for a limited purpose. For the purposes of the present prosecution, the ruling certainly did not constitute a determination that the accused's activity was not a part of the same conspiracy to which Abel and Hayhanen were parties. Cf. Sealfon v United States, 332 US 575, 92 L ed 180, 68 S Ct 237 (1948).

of these wore Russian uniforms "worn by high ranking officers." While not explicitly spelled out, it can reasonably be inferred from accused's statements that at that meeting, he agreed to report to them "conversations" he might "overhear." Four other meetings were held between the accused and "Soviet personnel" in the same apartment, which included "one of the ones present in uniform during the initial meeting." The meeting place was then shifted to another apartment and meetings were held about once a month.

In all, the accused attended about fifteen meetings. At these meetings he "cooperat[ed] with the Soviets." Among other things he signed "papers"; he was asked a "lot of specific questions" and he gave "them specific answers" but he could not recall the exact nature of them. He did remember that he told the Soviets of his own background and his family life, his code training in the military, of events that transpired at the Embassy, and of the habits of State Department and military personnel in the Embassy. He further recalled that the Air Attache of the United States once took pictures of an aircraft or guided missile factory, and he "told this to the Soviets." Inferentially, it may be concluded he had also indicated willingness to provide information about documents he saw in the Embassy. Thus, in one of his statements, he said that at a meeting with the contact who substituted for Bob Smith "while he was away," he was shown a camera measuring about 2-1/2 x 1-1/2 x 3/4 inches. The contact, the statement continues, "told me to take it back into the Embassy stating that if I did not have time to read documents in the Embassy, I could photograph them and bring the negatives back to the Soviets." It was proposed that the accused photograph matter in the military attache's office. Some discussion followed about the risk of detection which apparently resulted in the accused's departure from the meeting without taking the camera. In the course of his activities, the accused received from $2,500.00 to $3,000.00 from the Russians.

Before his return to the United States the accused expressly agreed to "continue to cooperate" with the Soviets. Part of the arrangements included the establishment of identification as an agent by means of a specially designed smoking pipe which he "was to carry either in . . . [his] mouth or in . . . [his] hand." His pretrial statements about the arrangements are as follows:

"About the last three meetings prior to my leaving Moscow, they had drilled into me instructions for making a contact in the United States. They had requested that I continue to cooperate with them in the United States and I had agreed to do so feeling that I was in it by this time up to my neck. I could see no other way out.

. . . . .

"It had been previously agreed that if the Soviets did not contact me within one year after my return to the United States, I was to use the above method of getting in touch with them. If however, I wanted to get in touch with them on my own prior to their contacting me, I could use this same method to start an approach on my part.

"I agreed before I left Moscow to follow their instructions, however, since I returned to the United States, I did not utilize the above method to get in touch with the Soviets nor did the Soviets attempt to get in touch with me to the best of my knowledge.

"I know of no attempts to get in touch with me on the part of the Soviets nor do I know of any attempts on the part of unknown individuals to reach me except for one instance which is as follows:

"Some time ago, about two years ago this summer, my sister, Arline Brown, who resides in Howard, Colorado, received a call from a foreign speaking person who wanted to know what my address was at this time and implied that he wanted to get in touch with me. My sister told this unknown individual that at this time I was living in Tucson, Arizona and

741

she wrote me and told me of this, however, this unknown individual did not contact me nor did anyone else."

Although the accused did not itemize the information he gave the Russians, it compellingly appears it ▮ did not consist, as appel-
 ▮ late defense counsel contend, merely of rumor and innocuous conversation available to any casual bystander. On his own admission, the accused gave "specific answers" about "specific events" at the Embassy. He gave them specific information about the Air Attache which he learned only because he was the driver on the trip in which the photographs were taken; he told them about his code training, which reasonably appears from the circumstances to have included information about the techniques and the content of the training; and, finally, he apparently indicated a willingness to report on documents that he might see in the Embassy. The accused specifically agreed to continue to cooperate with the Soviets after he returned to the United States. To what extent would he cooperate? Obviously, to the same extent and along the same lines that he had already cooperated in Moscow. That cooperation manifestly had provided the Soviets with information which comprehended "things connected with the national defense." Obtaining such information was exactly the purpose of the Abel-Hayhanen conspiracy. It is significant indeed that the means by which Hayhanen established his identity as an agent corresponded to the means which the accused was to use for that purpose. Of course, the accused did not know the specific persons who would help him in carrying out the criminal purpose of his agreement, but he obviously knew that there would be others. Knowledge of the identity of co-conspirators and their particular connection with the criminal purpose need not be established. Chadwick v United States, 117 F2d 902 (CA 5th Cir) (1941); United States v Andolschek, 142 F2d 503 (CA 2d Cir) (1944). The arrangements for establishing contact show that the accused knew and anticipated he would find co-

conspirators in the United States and Mexico. Hayhanen testified that the committee on information was the exclusive Soviet agency in charge of American espionage at the times in issue. This agency sent him to the United States and provided him with information about the accused which agreed in close detail with that disclosed by the accused to the persons with whom he dealt in Moscow. The means by which they were to establish identity as a co-conspirator were substantially the same. Unlike the situation in *Kotteakos,* on which the accused heavily relies, there is here substantial evidence that the accused's activities in Moscow and those of Abel-Hayhanen in the United States were "tied together as stages in the formation of a larger all-inclusive combination." Blumenthal v United States, 332 US 539, 92 L ed 154, 68 S Ct 248 (1947).

In a different but related attack on the conspiracy charge, the accused contends he cannot be tried for the offense because the specification does not allege any overt act by him during his current enlistment. The accused was discharged on November 17, 1955, but re-enlisted the next day. The specification alleges that the conspiracy extended to about May 1957, with an overt act committed by Abel and Hayhanen in February 1957. There is no merit to this assignment.

Once a conspiracy is established, the act of any of the conspirators is the act of all. Brock v Hudspeth, 111 F2d 447 (CA 10th Cir) (1940). As a result, it has been held that the last overt act fixes the time for the running of the statute of limitations and the venue or place of trial for all the conspirators. See Kaplan v United States, 7 F2d 594 (CA2d Cir) (1925). Appellate defense counsel maintain that the principle has no application here because of the intervening discharge of the accused. See United States v Martin, 10 USCMA 636, 28 CMR 202. The allegation and the proof, however, show a continuing conspiracy, without evidence of withdrawal by the accused. United States v Graham, 102 F2d 436 (CA2d Cir)

(1939). Since the agreement continued into the accused's present enlistment and the overt act was committed in that period, the accused is subject to trial and punishment for the offense. In United States v Frayer, 11 USCMA 600, 29 CMR 416, we considered the effect of an intervening discharge on a continuing offense. We said:

". . . [W]here acts . . . are continued from one period of enlistment into another, prosecution will will lie for those acts performed during the latter enlistment without regard to the fact of an intervening discharge."

Moving to the false official statement offense alleged in the Additional Charge, the accused contends that the evidence is insufficient to support the findings of guilty. The specification alleges that the accused made a false official statement by submitting a loyalty certificate form in which he falsely represented he "had not engaged in espionage or attempts or preparations therefor and that he had not made an intentional unauthorized disclosure to any person under circumstances which might indicate disloyalty to the United States of information of a classified or non-public nature." We need not restate the evidence. Enough has been set out to show that in his pretrial statements the accused admitted the commission of acts amounting to espionage and the disclosure of information which, if not of a classified nature, was of a "non-public" character. The only question, then, is whether there is sufficient independent evidence of the probable commission of the offense to meet the requirements of the *corpus delicti* rule. Hayhanen's testimony of his communication with Moscow in regard to the accused and the receipt by him of information indicating the accused had told Soviet agents he had been trained in code work and was returning to the United States for training "as a mechanic of the coding machines" establishes probability of the disclosure of information of the kind alleged in the specification. We hold there is ample evidence to support the findings of guilty of the Additional Charge.

Three purported errors are grouped together in an assignment contending that the findings of guilty must be set aside because of cumulative error. In our opinion, the assignment has no merit; and only one of the matters set out in the appellant's brief needs comment. Originally, the conspiracy specifications alleged that the conspiracy extended from November 1951 to May 1957, and twenty-five overt acts were described. Before arraignment, defense counsel moved that the existing charges not be presented to the court-martial until he could obtain a ruling on a motion he wanted to interpose. An out-of-court hearing was held in which defense counsel moved to strike from the specifications overt acts which were committed more than two years before the receipt of charges by the officer exercising summary court-martial jurisdiction over the accused, as being barred by the statute of limitations. The motion was denied by the law officer. See United States v Flynn, 103 F Supp 925 (SD NY) (1951). When court reconvened, arraignment was had. With the accused's consent, trial counsel omitted reading the charges, but presented to each court member a copy of the Charge Sheet. At that point, at defense counsel's request, another out-of-court hearing was held. Defense counsel then informed the law officer that the accused had been honorably discharged on November 17, 1955, and he re-enlisted on November 18. He moved to delete from the specifications reference to all matters antedating the accused's re-enlistment. The motion was granted and appropriate changes were made in the specifications. As a result, all reference to twenty-three of the overt acts was deleted. When court was reconvened, the copies of the original Charge Sheet were withdrawn from the court members and the law officer instructed the court-martial as follows:

". . . If any of you gentlemen have read the prior Specifications and remember that certain portions have been deleted, you are instructed to completely disregard those portions. You will base your findings complete-

**743**

ly on the Specifications as read to you."

Trial counsel read the amended specifications to the court-martial. Appellate defense counsel now ██ intimate that the inclusion ██ of overt acts committed before the accused's discharge was deliberately calculated by the prosecution to "suggest there was a great deal of smoke . . . [and therefore] there must be some fire." The question of responsibility for matters transpiring in the previous enlistment was not free from doubt. United States v Frayer, supra. There is nothing in the record of trial to show an improper motive on the part of the prosecution in setting out these earlier acts. See United States v Johnson, 3 USCMA 447, 13 CMR 3. In fact, the defense is not itself free from responsibility in the matter. Had it presented the discharge motion at the same time as the motion on the statute of limitations, the original specification would not have come to the attention of the court members. Be that as it may, there is no possibility of prejudice because most of the matter complained of was properly admissible in evidence and was in fact introduced at the trial. It is well-settled that evidence of an overt act constituting a substantive offense is admissible to establish a conspiracy, even though prosecution of the overt act as a separate offense is barred. United States v Johnson, 165 F2d 42 (CA3d Cir) (1947). By the same token, such evidence is admissible although it does not itself constitute a substantive offense.

Lastly, the accused maintains that, inasmuch as it dismissed specification 1, Charge I, the board of review had no power to reassess a sentence based upon the findings of guilty of specification 2, but was limited to a sentence upon the false statement offense. The argument is founded upon an instruction by the law officer at the trial.

It will be recalled that the court found the accused guilty of both specifications of Charge I and the Additional Charge. In instructing on the sentence, the law officer advised the court-

**744**

martial that the maximum sentence "for the offenses" was dishonorable discharge, total forfeitures of all pay and allowances, and confinement at hard labor for life. He then proceeded to "break-down" the maximum punishment for each offense. The instruction is as follows:

"The court is advised that the maximum sentence that may be adjudged for the offenses of which the accused has been convicted is dishonorable discharge, total forfeiture of all pay and allowances, and confinement at hard labor for life. . . .

. . . . .

". . . The break-down as to each Specification is this: As to the offense set forth in Specification 1 of the Charge, the maximum punishment is dishonorable discharge, total forfeiture of all pay and allowances and confinement at hard labor for life. *The offense set forth in Specification 2 of the Charge will be disregarded by the court in the matter of sentence as it involves a very similar course of conduct and acts as those contained in Specification 1.* The maximum punishment for the offense set forth in the Specification of the Additional Charge is dishonorable discharge, total forfeitures of all pay and allowances and confinement at hard labor for one year. So the maximum, as I have previously stated, is dishonorable discharge, total forfeiture of all pay and allowances and confinement at hard labor for life."

The accused contends that the instruction is tantamount to dismissal of specification 2. In our opinion, he misconceives the import of the instruction. All that the instruction was intended to do was to emphasize, for the court members, the relative seriousness of each offense, and how the previously stated maximum had been determined. The instruction does not dismiss specification 2, and it does not vacate the findings of guilty of that specification. Cf. United States v Strand, 6 USCMA 297, 20 CMR 13. That specification still remained, and the findings of

guilty still existed; punishment, however, was governed by the limits prescribed for the more serious offense alleged in specification 1. In other words, the sentence was single and gross for all the offenses; dismissal of one charge did not deprive the board of review of the right to reassess the sentence on the basis of the remaining charges. See Jackson v Taylor, 353 US 569, 1 L ed 2d 1045, 77 S Ct 1027; United States v French, 10 USCMA 171, 27 CMR 245.

The decision of the board of review is affirmed.

Judges LATIMER and FERGUSON concur.