UNITED STATES, Appellee,

v.

Craig M. GLADUE, Sergeant, U. S. Air
Force, Appellant.

No. 31,619.
ACM 21882.

U. S. Court of Military Appeals.

Nov. 7, 1977.

Major John A. Cutts, III, argued the cause for Appellant, Accused. With him on the brief was Colonel Jerry E. Conner.

Major Alvin E. Schlechter argued the cause for Appellee, United States. With him on the brief were Colonel Julius C. Ullerich, Jr. and Captain Frederick P. Waite.

## Opinion of the Court

PERRY, Judge:

The appellant was convicted of possession of heroin and of conspiracy to introduce heroin into a military aircraft for the purpose of transfer to the United States, in violation of Articles 134 and 81, Uniform Code of Military Justice, 10 U.S.C. §§ 934 and 881, respectively. He was sentenced to a bad-conduct discharge, confinement at hard labor for 18 months, forfeiture of $200 per month for 18 months and reduction to the lowest enlisted grade. The United States Air Force Court of Military Review has affirmed. However, by order of the Commander of Lowry Air Force Base, dated February 17, 1976, the remaining portion of the appellant's confinement was remitted. We granted review to consider the appellant's claims that (1) the court-martial lacked jurisdiction to try the offenses; and (2) the decision of this Court in *United States v. Courtney*[1] precluded prosecution of the appellant for possession of heroin under Article 134, UCMJ, but required that such prosecution be brought, if at all, under

Article 92. Both of these contentions are resolved against the appellant. Therefore, we affirm.

### I

The facts upon which this case arose are not in dispute. In November 1974, the appellant along with Staff Sergeant Charles Carey, Sergeant Timmy Ring and one Phillip Kathman, who was thought to be a party to the conspiracy from its origin but who actually was a planted informant working with the Office of Special Investigations (OSI), rendezvoused at a bungalow located outside U-Tapao Airfield, Thailand. The meeting had been arranged on the U-Tapao flightline because it was anticipated that the appellant would serve as the crew chief aboard a military aircraft which was leaving U-Tapao Airfield, Thailand, for return to March Air Force Base, California. At the bungalow, it was agreed that the appellant would take heroin on his military aircraft and that the heroin would be secreted in certain selected places aboard the aircraft. Sergeant Gladue was to unload the aircraft at March Air Force Base and then deliver the heroin to Mather Air Force Base, California, to Sergeant Carey's distributor, a Sergeant William D. Hussey. After the appellant had intimated that he planned to purchase some heroin so he could take it back with him to March Air Force Base, it was suggested that they combine their heroin and share the profits equally among themselves and the distributor. Several weeks prior to the departure of his aircraft from Thailand, the appellant and Sergeant Ring placed three canisters of heroin aboard the aircraft.[2] When the plane was inspected by agents at U-Tapao Airfield just prior to its departure for California, the three canisters were discovered and confiscated. An additional quantity of heroin, however, which had also been placed on the aircraft, was not discovered during the inspection and it was flown into March Air

1. 1 M.J. 438 (1976).

2. The possession of these three canisters of heroin by the appellant was the basis for the

allegations contained in Charge II that the appellant "did at or near U-Tapao Air Field, Thailand, on or about 6 November 1974, wrongfully have in his possession . . . heroin."

Force Base. In early December 1974, the appellant delivered the heroin to Sergeant Hussey in Sacramento, California.

OSI agents formulated a plan which was designed to aid them observe and capture the participants while in the possession of the heroin and while acting in furtherance of the plan which had been made in Thailand. The plan was that Kathman (the informant) would feign an emergency which would necessitate his immediate return to the United States. On January 21, 1975, when Kathman was to embark on a feigned emergency leave to the United States, Sergeant Carey placed heroin in plastic tubing which was inserted in an arm cast worn by Kathman. Kathman was to deliver this heroin to Sergeant Hussey upon his arrival at Sacramento, but when his military aircraft stopped at Guam, OSI agents removed the cast and tubing and then recast his arm. Upon his arrival at March Air Force Base on January 22, 1975, he was given lactose and cremora to replace the heroin. On the same day Kathman proceeded to telephone the appellant to apprise him that he had brought in some more heroin and that he needed the appellant's assistance to get to Sacramento to deliver the heroin to Sergeant Hussey. While the appellant declined to take him to Sacramento, he did make the airline reservations for Kathman and paid for his tickets. The appellant also reminded Kathman that since he was never reimbursed for his expenses in the first operation, he still expected payment; that if Kathman could not effectuate the delivery of the heroin, he would hold it until Sergeant Carey came to the United States or until he had received instructions.

On January 24, 1975, Kathman arrived in Sacramento where he was met by Sergeant Hussey at the air terminal. They went to a hotel room where Kathman gave Hussey the fake heroin. Hussey was arrested by OSI agents as he departed the hotel room.

Two contentions are presented here by the appellant. First, he contends that since he was not charged with the possession of heroin (the Article 134 violation) until after he had been discharged from the military on January 20, 1975, and had reenlisted,[3] his discharge precluded court-martial jurisdiction as to this offense. Second, he contends that he could not be tried for the conspiracy offense (the Article 81 violation) because the overt act of transferring the fake heroin to Hussey, although committed during the appellant's subsequent enlistment, was not service connected. These contentions will be separately discussed.

II

*Jurisdiction over the Heroin Possession Offense*

Article 3(a), UCMJ, 10 U.S.C. § 803(a) provides:

Subject to Section 843 of this title (article 43), no person charged with having committed, while in a status in which he was subject to this chapter, an offense against this chapter, punishable by confinement for 5 years or more and for which the person cannot be tried in the courts of the United States or of a State, a Territory, or the District of Columbia, may be relieved from amenability to trial by court-martial by reason of the termination of that status.

It is clear that under Article 3(a), the court-martial had jurisdiction to try the appellant for the heroin possession offense unless (1) this offense was not punishable by confinement for 5 years or more, or (2) the offense was triable in trial courts of the United States or of a State, a Territory, or the District of Columbia. *United States v. Ginyard,* 16 U.S.C.M.A. 512, 37 C.M.R. 132 (1967); *United States v. Winton,* 15 U.S.C. M.A. 222, 35 C.M.R. 194 (1965).

In the instant case, by operation of Article 3(a) alone, court-martial jurisdiction existed over the heroin possession offense, since the two requirements of that Article

3. During the course of the court-martial proceedings, counsel agreed that the appellant was discharged from the Air Force on January 20, 1975, and that he had immediately reenlisted on January 21, 1975.

**4**

are met. The first requirement—that the offense be one which is punishable by confinement for 5 years or more—is fulfilled, since at the time of the appellant's court-martial, the offense of wrongful possession of heroin was punishable under Article 134, UCMJ, by confinement at hard labor for 10 years. Paragraph 127c, Manual for Courts-Martial, United States, 1969 (Revised edition). *But see United States v. Jackson,* 3 M.J. 101 (C.M.A.1977); *United States v. Courtney,* 1 M.J. 438 (1976). The second requirement—that the offense be one which is not triable in trial courts within the United States or its Territories—is also fulfilled, since civilian courts cannot indict and try a person for simple possession of a controlled substance in a foreign country. Here it is undisputed that the appellant possessed heroin in the Kingdom of Thailand.

 We have fully considered the argument advanced by the appellant that Congress contemplated extraterritorial application of Title 21 U.S.C. 844(a),[4] thus making indictable the possession of any controlled substance no matter where it was possessed in the universe by an American. Whether Congress in fact intended such extraterritorial application of a penal statute, which Congress clearly had the power to provide, *see Blackmer v. United States,* 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932), is thus the question. Section 844(a), *supra,* contains no provisions for extraterritorial application. Absent any evidence of a contrary intent, Congressional legislation is ordinarily presumed to apply only intraterritorially. *United States v. Pizzarusso,* 388 F.2d 8 (2nd Cir. 1968), *cert. denied* 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968); *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909). But application of

a penal statute is not automatically limited to crimes committed within the territorial jurisdiction of the sovereign just because a penal provision lacks express language that it should be applied extraterritorially. To the contrary, the Supreme Court in *United States v. Bowman,* 260 U.S. 94, 97–98, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922), said:

> The necessary *locus,* when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime, and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds which affect the peace and good order of the community, must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard. . . .
>
> But the same rule of interpretation should not be applied to criminal statutes, which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction or fraud, wherever perpetrated, especially if committed by its own citizens, officers, or agents. Some such offenses can only be committed within the territorial jurisdiction of the government because of the local acts required to constitute them. Others are such that, to limit their locus

---

4. 21 U.S.C. section 844(a) reads as follows:
It shall be unlawful for any person knowingly or intentionally to possess a controlled substance unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice, or except as otherwise authorized by this . . chapter. Any person who violates this sub-

section shall be sentenced to a term of imprisonment of not more than one year, a fine of not more than $5,000, or both, except that if he commits such offense after a prior conviction or convictions under this subsection have become final, he shall be sentenced to a term of imprisonment of not more than 2 years, a fine of not more than $10,000, or both.

to the strictly territorial jurisdiction, would be greatly to curtail the scope and usefulness of the statute, and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

■ In *United States v. Bowman, supra,* the Supreme Court discerned two classes of penal statutes: (1) statutes punishing crimes against the peace and good order of the community (which apply only to acts committed within the territorial jurisdiction of the United States unless Congress had specifically directed otherwise); and (2) statutes punishing fraud or obstructions against the United States Government (which include by implication acts which were committed in foreign countries). Since the possession of a controlled substance affects the peace and good order of the community and section 844(a) contains no congressional language to the contrary, the provision is deemed to be intended to apply only within the jurisdictional limits of the United States. Indeed, the natural and probable place of any possession offense is normally within the United States. Moreover, the fact that Congress clearly granted extraterritorial application to 21 U.S.C. § 959,[5] while it omitted a similar grant in 21 U.S.C. § 844, though both statutes regulate narcotics, is even more evidence that section 844 was not intended to be applied extraterritorially. Thus, this conclusion renders it unnecessary for us to consider whether the extraterritorial application of 21 U.S.C. 844(a) is internationally permissible.

5. For example, section 959 provides:
 It shall be unlawful for any person to manufacture or distribute a controlled substance in schedule I or II—
 (1) intending that such substance will be unlawfully imported into the United States; or
 (2) knowing that such substance will be unlawfully imported into the United States. *This section is intended to reach acts of*

## III

### *Jurisdiction over the Conspiracy*

■ We agree with the appellant that the effect of his discharge on the specification alleging conspiracy is to require that an overt act be shown to have been committed during his current enlistment. At least one overt act must have been committed in furtherance of the conspiracy during the appellant's current enlistment. *United States v. Rhodes,* 11 U.S.C.M.A. 735, 29 C.M.R. 551 (1960). As the facts of this case evince, on and after January 21, 1975 (the date of the appellant's reenlistment into the Air Force), there were several overt acts committed in furtherance of the conspiracy by the appellant and his co-conspirators. Reference is made to the following overt acts: on January 21, 1975, Sergeant Carey concealed heroin in Sergeant Kathman's arm cast; Kathman traveled to the United States from Thailand on military aircraft on January 21; the appellant arranged air transportation for Sergeant Kathman on January 22, 1975; Sergeant Kathman delivered the fake heroin to Sergeant Hussey on January 25, 1975. The appellant was properly charged with conspiracy since the above overt acts were committed in his current enlistment.

■ One final inquiry remains and that is to ascertain whether the conspiracy offense was service connected. Here the Government correctly recognizes that the overseas exception is not present in this case since the essence of the conspiracy was to import heroin into the United States—an offense which is clearly cognizable in the United States civil courts. *See* 21 U.S.C. §§ 952 and 963; *United States v. Black,*

*manufacture or distribution committed outside* the *territorial jurisdiction of the United States.* Any person who violates this section shall be tried in the United States District Court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia. (Emphasis added).

1 M.J. 340 (1976); *United States v. Beeker,* 18 U.S.C.M.A. 563, 40 C.M.R. 275 (1969). Hence, "[o]nce it is judged that the overseas exception is not present in this case, the inquiry must then advance to the stage of applying the *O'Callahan*[6] standard and the *Relford*[7] criteria to determine whether there exists 'service connection' so as to vest jurisdiction in the military nonetheless." *United States v. Black, supra,* 1 M.J. at 345.

In urging against service connection, the appellant relies solely upon *United States v. Black, supra.* We believe however, that the facts of that case are distinguishable. In *Black,* the accused entered into a criminal agreement in Vietnam with a Vietnamese national to wrongfully import heroin into the United States. The single overt act charged was the off-post mailing of a letter by Black from the United States to a friend in Vietnam. In this letter, the accused had sent another letter and some currency, which were to be forwarded by the friend to the Vietnamese co-conspirator, who, in return, was to mail heroin to the accused addressed to a civilian address in Florida. The Court, after examining the *Relford* criteria, found that these factors militated against a conclusion of service connection over the conspiracy offense:

1. No relationship existed "between the appellant's military duties and the offense."

2. None of the conspiratorial acts were "committed on a military reservation" or had been designed by the conspirators to be "committed on a military reservation."

3. There was no relation between the offense and authority stemming from the war power.

4. The co-conspirator was neither a serviceman nor a dependent of a serviceman.

5. A federal civilian court had jurisdiction to indict and try the accused for the conspiracy offense.

6. No flouting of military authority was involved in the offense.

7. No threats were posed to the security of a military post.

8. Military property was not involved.

9. Conspiracy to import heroin into this country has been historically tried in civilian courts since "the Federal Government has an overriding interest therein and it is 'not specifically related to the military services.'"

However, in this case, unlike *United States v. Black, supra,* the abuse and misuse (at least in one operation) of the appellant's military duties as an aircraft crew chief were *the* prepense mechanism upon which the conspiracy was to be and, in fact, was effectuated. Here, even the object of the conspiracy was to misuse aircraft belonging to the United States Air Force in smuggling heroin into the United States. All the co-conspirators were servicemen. Some of the conspiratorial acts were clearly performed by the appellant while on military duty. Military airfields were used as transfer stations and conduits for illegal drug trafficking. Hence, the offense involved flagrant flouting of military authority and a violation of military property. Conceivably, this smuggling operation could have posed grave security threats to a military air base. Indeed, if there ever was "service-connection," this one is completely quintessential. In fact, we believe that both the misuse and abuse of the appellant's military duties and the misuse of a military aircraft to effectuate the criminal acts conferred service connection as contemplated by *O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), and *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).

### IV

The appellant's contention that under *United States v. Courtney, supra,* he was denied equal protection of the law by being charged and convicted of possession of heroin in violation of Article 134, UCMJ, 10 U.S.C. § 934, instead of Article 92,

---

6. *O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969).

7. *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).

UCMJ, 10 U.S.C. § 892, must likewise be resolved against him. This case came to trial prior to the date of our decision in *Courtney,* whose application we have limited to "cases tried or retried after the date of the *Courtney* decision . . ." *United States v. Jackson, supra.* Hence, the *Court-ney* rule does not control the appellant's case.

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge FLETCHER and Judge COOK concur.