UNITED STATES, Appellee,

v.

Sergeant Gerald A. HUBBLE, 362–74–9259, United States Army, Appellant.

ACMR 9102346.

U.S. Army Court of Military Review.

27 Jan. 1993.

For Appellant: Gregory E. Stambaugh (argued); Captain Paul H. Turney, JAGC (on brief).

For Appellee: Major Timothy W. Lucas, JAGC (argued); Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Joseph A. Russelburg, JAGC, Major Joseph C. Swetnam, JAGC (on brief).

Before CREAN, GONZALES, and DELL'ORTO, Appellate Military Judges.

## OPINION OF THE COURT

GONZALES, Judge:

The appellant was convicted, contrary to his pleas, by a general court-martial composed of officer members on 23 August 1991, of conspiracy to commit armed robbery and larceny in violation of Articles 81 and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 881 and 921 (1982) [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a bad-conduct discharge, confinement for two years, and reduction to Private E1.

On appeal, the appellant asserts six assignments of error, the first two of which contend that: (1) the finding of guilty of conspiracy to commit armed robbery is incorrect in law and fact, and (2) the finding of guilty of larceny is incorrect in law and fact. We disagree and affirm the findings of guilty and the sentence.

The appellant was assigned to the 57th Ordnance Detachment at Fort Belvoir, Virginia. Unbeknownst to him, during the months of March and April 1991, two other members of the detachment, Staff Sergeant (SSG) Kinzer and SSG Shattles, had been discussing the possibility of robbing an armored car on Fort Belvoir. Staff Sergeant Kinzer had a reputation in the detachment for making wild suggestions. When SSG Shattles realized that SSG Kinzer was serious about this particular idea, he reported their robbery discussions to the company commander. He referred SSG Shattles to the Criminal Investigation Division (CID). Staff Sergeant Shattles agreed to assist the CID, and later the Federal Bureau of Investigation, in monitoring and recording future conversations he had with SSG Kinzer.

As SSG Kinzer's robbery plan became more definite, he realized it required a third member, and he chose the appellant. On Monday, 6 May 1991, SSG Kinzer invited the appellant to his quarters on the pretext of discussing an evaluation report he would be submitting on the appellant's

duty performance. Shortly after the appellant's arrival, however, SSG Kinzer began to explain the plan to rob an armored car while it was at a bank on post. They would use explosive devices that SSG Shattles would make. Except for the C–4 explosive, SSG Shattles had everything he needed to make the devices, including the blasting caps.

Initially, the appellant listened to SSG Kinzer's concept, which included such details as acquiring weapons, using masks and disguises, stealing a vehicle from a parking lot on post to use in the robbery, setting off explosions around the post to focus attention away from the bank, disposing of the paint/dye canisters inside the money bags, reviewing the escape route, changing clothes in a parking lot off post, abandoning the stolen vehicle, and laundering the money through a casino in Atlantic City, New Jersey.

The appellant's role in the plan would be to assist SSG Kinzer steal C–4 explosives from the detachment the following week and act as the driver and shooter during the robbery. Staff Sergeant Kinzer asked the appellant several times if he was "in" and each time the appellant indicated that he was. Staff Sergeant Shattles also asked the appellant the same question when SSG Kinzer went to the bathroom, and the appellant again indicated "yes." The appellant returned to his home when the meeting ended after a couple of hours, leaving SSG Kinzer and SSG Shattles with the impression that they had secured the services of the needed third party.

Again, unbeknownst to the appellant, SSG Kinzer went to Fort Pickett, Virginia, on Monday, 13 May, with Sergeant (SGT) Erickson to detonate some ordnance in a "demo shot." [1] Two blasting caps and three M–60 igniters remained unused after the shot. The two sergeants agreed not to return these items to the Ammunition Supply Point (ASP) as required by regulation, but to keep and dispose of them in an easier and more convenient way. Staff

Sergeant Kinzer took possession of the two blasting caps and SGT Erickson took the three igniters.

The following day, 14 May, SSG Kinzer was in his front yard and waved SSG Shattles over as he drove by. Staff Sergeant Kinzer showed SSG Shattles the two blasting caps he had unlawfully taken at Fort Pickett and said that they could use them to make grenades.

Also on 14 May 1991, SSG Kinzer asked SGT Brown, another member of the detachment, to call the Central Clearance Facility (CCF) at Fort Meade, Maryland, to check on SSG Kinzer's security clearance. Sergeant Brown made the call at 1330 hours and the person at the CCF told him that SSG Kinzer was under a CID investigation. When SGT Brown got off the phone, he turned to the appellant, who was the only other person in the room, and repeated this revelation to him. Sergeant Brown then reported the information to the company commander. The company commander told SGT Brown not to tell anyone and to go to the CID office and talk with the agents who were handling the case. When SGT Brown came out of the commander's office, he told the appellant that he should not have told him about the investigation, and the appellant told SGT Brown not to tell anyone that he had given him the information.

Sergeant Brown went to the CID office and met with the agents. After talking with them, he realized that he had jeopardized their investigation. The following day, 15 May, he told the appellant, on his own accord, that the whole matter was a misunderstanding; that the person at the CCF had made a mistake on SSG Kinzer's social security number and SSG Kinzer was not under a CID investigation as originally reported.

About an hour later, the appellant and SSG Kinzer were given a mission to go to Fort Pickett to render safe a couple of mortars with misfired rounds in their tubes. As they prepared for their trip, the

---

1. A "demo shot" is the detonation of ordnance that has been designated to be eliminated or thrown away.

appellant told SSG Kinzer that he was under investigation by the CID. Staff Sergeant Kinzer was startled and wondered what could have triggered an investigation on him. He initially thought it may be because of the traffic tickets he had not paid or the personal weapon he recently had pawned.

The appellant could not go with SSG Kinzer to the ASP in preparation for their mission to Fort Pickett because he was called home to attend to a family matter. Specialist (SPC) Nutter went to the ASP in the appellant's place to help SSG Kinzer get the necessary explosives to take to Fort Pickett. Staff Sergeant Kinger got C–4, igniters, time fuses, but no blasting caps. When SPC Nutter asked SSG Kinzer if he was going to get any blasting caps, SSG Kinzer said "no" and explained that he already had two caps that were left over from the last demo shot.

Thereafter, SSG Kinzer picked up the appellant at his home and they drove to Fort Pickett. On the way, SSG Kinzer told the appellant that because of the CID investigation, the armored car robbery was "off." While they were at Fort Pickett, all of the items taken from the ASP and the two blasting caps taken from the previous shot were detonated.

The following afternoon, on 16 May, SSG Kinzer told SSG Shattles that he may be under a CID investigation, but he was not certain why. Nevertheless, SSG Kinzer said he had disposed of everything he had for the robbery, including the blasting caps, which were used in the detonation at Fort Pickett the day before.

The CID investigation was terminated the next day, 17 May, and SSG Kinzer and the appellant were apprehended for the offenses for which the appellant was convicted in a separate trial.

At trial, the appellant admitted that he said "yes" when SSG Kinzer asked him at least twice on 6 May 1991 if he was "in." He also testified that he had no intentions of participating in the robbery. On his way home after the meeting, he realized he did not want to be involved in this activity and thought the best way to ensure that he was not was to avoid both SSG Kinzer and SSG Shattles for the next few weeks. The appellant was married with a child and on orders for a permanent change of station (PCS) to report to Hawaii in two months. He did not want to jeopardize either his family or his future assignment. The appellant had no contact with either SSG Kinzer or SSG Shattles between 6 May and 15 May, and had no knowledge that SSG Kinzer took the blasting caps until 15 May when they went to Fort Pickett together. Also, he felt that he never agreed to help SSG Kinzer steal C–4 from the detachment, and, in fact, he did not do so.

In addressing the appellant's first assignment of error, which incorporates the second assignment of error because of the overt act of larceny, the test for legal sufficiency is whether, considering the evidence in the light most favorable to the government, the trier of fact could rationally find the existence of every element of the offenses beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Blocker,* 32 M.J. 281, 284 (C.M.A.1991). The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, this Court is itself convinced of appellant's guilt beyond a reasonable doubt. UCMJ art. 66(c) 10 U.S.C. § 866(c); *United States v. Turner,* 25 M.J. 324 (C.M.A.1987).

During oral argument on this case, the appellant conceded legal sufficiency, and argued his position based on factual sufficiency of the evidence alone. Specifically, we are urged to find that the evidence in the record of trial does not support the appellant's intention to join the conspiracy to commit armed robbery, and secondly, if it does, no overt act to effectuate the conspiracy was committed by any of the conspirators.

This case illustrates one of King Solomon's proverbs that remains valid today,

"[t]o plan evil is as wrong as doing it." [2] The plan in this case involved a conspiracy to commit armed robbery. The elements of proof for the offense of conspiracy are:

(1) That the accused entered into an agreement with one or more persons to commit an offense under the code; and (2) That, while the agreement continued to exist, and while the accused remained a party to the agreement, the accused or at least one of the co-conspirators performed an overt act for the purpose of bringing about the object of the conspiracy.

Manual for Courts–Martial, United States, 1984, Part IV, para. 5b(1) and (2) [hereinafter MCM, 1984].

■ In every conspiracy case, a plea of not guilty renders the defendant's intent to join the conspiracy a material issue and imposes a difficult burden on the government. *United States v. Roberts*, 619 F.2d 379 (5th Cir.1980). We are convinced that the government satisfied this burden by proving the appellant's intent to join a conspiracy to commit armed robbery beyond a reasonable doubt. The evidence shows that on 6 May 1991, SSG Kinzer explained every detail of his robbery plan to the appellant, to include how the robbery was to be accomplished and the role the appellant would play in it. Both during and at the end of the two-hour briefing, the appellant was invited to join the criminal enterprise by SSG Kinzer and SSG Shattles and he told them at least three times that he was "in." This convinced them that the appellant had joined them. They did not seek the participation of a different third person whose assistance was vital to the success of their plan.

■ "Once a conspiracy is established, the [overt] act of any of the conspirators is the act of all." *United States v. Rhodes*, 11 U.S.C.M.A. 735, 29 C.M.R. 551, 558 (1960). "The function of the overt act in a conspiracy prosecution is simply to manifest 'that the conspiracy is at work' ... and is [not] a project still resting solely in the minds of the conspirators." *Yates v. United States*, 354 U.S. 298, 334, 77 S.Ct. 1064, 1085, 1 L.Ed.2d 1356 (1957) (citation omitted). The evidence in this case clearly shows an overt act by one of the conspirators was committed in furtherance of the conspiracy. After enlisting the appellant, SSG Kinzer stole two blasting caps on 13 May 1991, and then disclosed to SSG Shattles the following day that the reason he stole these two caps was so that they "could use them to make grenades." A further indication that the caps were intended to further the conspiracy was the circumstances of their disposal. It was only after SSG Kinzer was tipped by the appellant that he was under CID investigation that he quickly disposed of the two caps.

■ The law allows a person to withdraw from a conspiracy after he has joined, but it is very specific about what must be done before withdrawal can be a complete defense. First, the withdrawal must be done before the commission of an overt act by any conspirator. Secondly, it must consist of affirmative conduct and demonstrate that the party has severed all connection with the conspiracy. MCM, 1984, Part IV, para. 5c(6). Until the co-conspirators are notified of a withdrawal by one of the parties to their conspiracy, they continue to be influenced by the support he has given. The requirement of affirmative conduct to sever all connection with the conspiracy, in part, is imposed in the hopes that the co-conspirators may also be dissuaded from committing the object crime.

■ In this case, in order to withdraw, the appellant was required to take some affirmative action to disassociate himself from the conspiracy prior to the larceny of the blasting caps on 13 May by SSG Kinzer. At no time did the appellant act in any manner that would constitute his withdrawal from the conspiracy. He never told SSG Kinzer or SSG Shattles that he would no longer participate in their plan. He did not report their plans to law enforcement authorities. He did not participate in any affirmative acts that were inconsistent with or could have terminated the conspira-

**2.** Proverbs 24:8 (The Living Bible Paraphrased, 17th printing, 1971).

cy. If he had done so, he would have communicated to his co-conspirators a reasonable understanding that he was no longer a part of the conspiracy. *See United States v. Johnson,* 25 M.J. 878, 886 (N.M.C.M.R.), *pet. denied,* 27 M.J. 286 (C.M.A.1988). We, therefore, hold that the appellant's unilateral decision to quietly avoid both SSG Kinzer and SSG Shattles and to never be in a position to assist SSG Kinzer steal C–4 from the detachment between 6 and 13 May, was not enough affirmative conduct to constitute withdrawal from the conspiracy he had joined on 6 May and whose creator he had warned about the CID investigation on 15 May.

We have considered the appellant's remaining four assignments of error and hold that no relief is warranted.

The findings of guilty and the sentence are affirmed.

Senior Judge CREAN and Judge DELL'ORTO concur.